ALLEN THOMAS LORD, Plaintiff-Appellant v. PAUL J. BEERMAN, M.D.; YADKIN RIVER RADIOLOGY, P.A.; HUGH CHATHAM MEMORIAL HOSPITAL, INC.; WAKE FOREST UNIVERSITY; WAKE FOREST UNIVERSITY BAPTIST MEDICAL CENTER; WAKE FOREST UNIVERSITY HEALTH SCIENCES; AND NORTH CAROLINA BAPTIST HOSPITAL, Defendants-Appellees

No. COA07-1550

(Filed 15 July 2008)

**Medical Malpractice— failure to diagnose or treat sooner— proximate cause—sufficiency of evidence—summary judgment**

The trial court did not err in a medical malpractice case by granting summary judgment in favor of defendants because: (1) to survive a motion for summary judgment in a medical malpractice action, plaintiff must forecast evidence demonstrating that the treatment administered by defendant was in negligent violation of the accepted standard of medical care in the community and that defendant's treatment proximately caused the injury; (2) where plaintiff alleges that he was injured due to a physician's negligent failure to diagnose or treat plaintiff's medical condition sooner, plaintiff must present at least some evidence of a causal connection between defendant's failure to intervene and plaintiff's inability to achieve a better ultimate medical outcome; (3) the connection or causation between the negligence and injury must be probable and not merely a remote possibility; (4) plaintiff's evidence was insufficient to establish the requisite causal connection between defendants' alleged negligence and plaintiff's blindness when neither of plaintiff's expert witnesses were able to testify that plaintiff's vision would be better today had defendants initiated steroid treatment sooner, nor were they able to testify that plaintiff's vision probably would be better; and (5) while plaintiff stresses that proximate cause is normally a question best answered by the jury, plaintiff must nevertheless provide a sufficient forecast of evidence to justify presentment to the jury.

Appeal by Plaintiff from orders entered 2 August 2007 by Judge Ronald E. Spivey in Superior Court, Surry County. Heard in the Court of Appeals 21 May 2008.

*The Law Offices of Robert O. Jenkins, by Robert O. Jenkins, for Plaintiff.*

LORD v. BEERMAN

[191 N.C. App. 290 (2008)]

*McGuireWoods, L.L.P., by Mark E. Anderson and Andrew H. Nelson, for Defendants Wake Forest University, Wake Forest University Baptist Medical Center, Wake Forest University Health Sciences, and North Carolina Baptist Hospital.*

*Wilson & Coffey, LLP, by Linda L. Helms and G. Gray Wilson, for Defendants Paul J. Beerman, M.D. and Yadkin River Radiology, P.A.*

McGEE, Judge.

The record in this case shows that on or about 18 December 2002, Allen Thomas Lord (Plaintiff) began to experience cloudy and blurred vision. Plaintiff made an appointment on 20 December 2002 to see his ophthalmologist, Dr. Wells Stewart (Dr. Stewart). Dr. Stewart could not determine the reason for Plaintiff's decreasing vision, and he sent Plaintiff to have a magnetic resonance imaging (MRI) scan of his brain and optic region at Hugh Chatham Memorial Hospital (Hugh Chatham Hospital). Plaintiff underwent an MRI scan at Hugh Chatham Hospital on the afternoon of 20 December 2002.

Dr. Paul J. Beerman (Dr. Beerman) is an employee of Yadkin River Radiology. Dr. Beerman regularly reads radiology images at Hugh Chatham Hospital. Dr. Beerman read Plaintiff's MRI images and found no abnormality to account for Plaintiff's symptoms. Dr. Beerman sent a copy of his findings to Dr. Stewart. Dr. Stewart contacted Plaintiff on the evening of 20 December 2002 and informed Plaintiff that his MRI results were normal.

Despite Plaintiff's test results, Plaintiff's vision continued to deteriorate rapidly. Dr. Stewart examined Plaintiff again on 22 December 2002 and arranged for Plaintiff to see neuro-ophthalmologist Dr. Timothy Martin (Dr. Martin) the following day at North Carolina Baptist Hospital (Baptist Hospital). However, when Plaintiff arrived at Baptist Hospital on 23 December 2002, he learned that Dr. Martin was on vacation. Plaintiff instead was seen by first-year ophthalmology resident Dr. David Gilbert (Dr. Gilbert), and third-year ophthalmology resident Dr. Gautam Mishra (Dr. Mishra). Doctors Gilbert and Mishra performed a number of tests on Plaintiff and noted that Plaintiff's previous MRI results were normal. Neither Dr. Gilbert nor Dr. Mishra could determine the cause of Plaintiff's symptoms. Dr. Mishra gave Plaintiff some eye drops and told Plaintiff that he would discuss Plaintiff's symptoms with Dr. Martin when Dr. Martin returned from vacation the following week.

Dr. Martin testified in his deposition that when he returned from vacation on 30 December 2002, he examined Plaintiff's MRI images:

[I]n this case I wanted to look at the [optic] chiasm. That was the area that was called into question by the patient's presentation.

. . . [T]here were some abnormalities in the [optic] chiasm.

. . . . [T]here was certainly enough to convince me that there was some mild chiasmal enhancement, which suggests that there was a real and organic and demonstrable basis for the patient's visual field loss.

Dr. Martin immediately contacted Plaintiff and asked him to return to Baptist Hospital as soon as possible. Plaintiff returned to Baptist Hospital on 30 December 2002. Dr. Martin immediately gave Plaintiff intravenous steroids and admitted Plaintiff to Baptist Hospital for further testing. Dr. Martin ultimately diagnosed Plaintiff as having "an autoimmune demyelinating chiasmopathy," which Dr. Martin described as "an unusual problem, an unusual presentation," and "so unusual and very[,] very strange."

Dr. Martin continued to treat Plaintiff with steroids over the following weeks. Plaintiff's vision improved slightly from the treatment and eventually stabilized. At present, Plaintiff is able to see some light and color, but he continues to suffer from substantial visual impairment.

Plaintiff filed a complaint on 19 April 2006 against Dr. Beerman, Yadkin River Radiology (together, the Beerman Defendants), Baptist Hospital, Wake Forest University Baptist Medical Center, Wake Forest University, and Wake Forest University Health Sciences (together, the Wake Forest Defendants).[1] Plaintiff first alleged that the Beerman Defendants were negligent in that on 20 December 2002, Dr. Beerman negligently misread Plaintiff's MRI images, failed to detect abnormalities in Plaintiff's optic chiasm, and reported to Dr. Stewart that Plaintiff's MRI scans were normal. Plaintiff next alleged that the Wake Forest Defendants were negligent in that on 22 December 2002, their employees failed to admit Plaintiff to the hospital or provide him steroid treatment, failed to diagnose the cause of Plaintiff's vision loss, failed to have Plaintiff examined by an ophthalmologist, and released Plaintiff without appropriate treatment

---

1. Plaintiff also filed suit against Hugh Chatham Hospital, which is not a party to this appeal.

or instructions.[2] Plaintiff further alleged that the Beerman Defendants' negligence and the Wake Forest Defendants' negligence were both direct and proximate causes of his blindness. The Beerman and Wake Forest Defendants filed answers denying the allegations in Plaintiff's complaint.

The Beerman Defendants filed a motion for summary judgment on 18 June 2007 arguing, *inter alia*, that Plaintiff "failed to produce competent evidence from a qualified witness that any alleged negligence by [the Beerman Defendants] proximately caused any injury to [P]laintiff." The Wake Forest Defendants filed a motion for summary judgment on 25 June 2007 also arguing, *inter alia*, that "Plaintiff has failed to produce competent evidence from a qualified witness that any alleged negligence by [the Wake Forest Defendants] proximately caused any injury to Plaintiff." The trial court entered orders on 2 August 2007 granting the Beerman and Wake Forest Defendants' motions, finding in each case that "there are no genuine issues of material fact and that [the respective defendants] are entitled to judgment as a matter of law[.]" Plaintiff appeals.

A trial court should grant a motion for summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2007). The moving party carries the burden of establishing the lack of any triable issue. *Roumillat v. Simplistic Enterprises, Inc.*, 331 N.C. 57, 62-63, 414 S.E.2d 339, 341-42 (1992). The movant may meet his or her burden "by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim[.]" *Collingwood v. G.E. Real Estate Equities*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). All inferences of fact must be drawn against the movant and in favor of the nonmovant. *Id.* We review a trial court's grant of summary judgment *de novo. Falk Integrated Tech., Inc. v. Stack*, 132 N.C. App. 807, 809, 513 S.E.2d 572, 574 (1999).

## A.

To survive a motion for summary judgment in a medical malpractice action, a plaintiff must forecast evidence demonstrating "that the

---

2. While Plaintiff's complaint alleges that these events occurred on 22 December 2002, the record reveals that Plaintiff actually first sought treatment with the Wake Forest Defendants on 23 December 2002.

treatment administered by [the] defendant was in negligent violation of the accepted standard of medical care in the community[,] and that [the] defendant's treatment proximately caused the injury." *Ballenger v. Crowell*, 38 N.C. App. 50, 54, 247 S.E.2d 287, 291 (1978). "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred[.]" *Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984).

Our Court's prior decisions demonstrate that where a plaintiff alleges that he or she was injured due to a physician's negligent failure to diagnose or treat the plaintiff's medical condition sooner, the plaintiff must present at least some evidence of a causal connection between the defendant's failure to intervene and the plaintiff's inability to achieve a better ultimate medical outcome. In *Lindsey v. The Clinic for Women*, 40 N.C. App. 456, 253 S.E.2d 304 (1979), for example, the plaintiff began to experience sharp pains, fluid leakage, and a bloody discharge in the late stages of her pregnancy. *Id.* at 457-58, 253 S.E.2d at 305. The defendant physicians examined the plaintiff multiple times, determined that she was having false labor, and told her to return to the clinic in one week. *Id.* at 458, 253 S.E.2d at 306. Plaintiff's child was later stillborn, and physicians determined the child's cause of death to be severe amnionitis and a prolapsed umbilical cord. *Id.* at 459, 253 S.E.2d at 306. At trial, the plaintiff's expert witness testified that "the course pursued by [the] defendant doctors . . . did not conform with approved medical practices[.]" *Id.* at 459-60, 253 S.E.2d at 306. Our Court held that the trial court erred in denying the defendants' motion for a directed verdict:

> [Plaintiff introduced] no evidence that anything which [the] defendants did or failed to do . . . either caused or could have prevented the amnionitis, which [the] plaintiff contends caused the death of her child and her own prolonged suffering. [The plaintiff's] expert witness . . . . never testified that had what he considered to be "approved medical practices" been followed by the defendants in their treatment of the plaintiff in this case, [the plaintiff's] child would not have been stillborn and her own recovery would not have been prolonged by amnionitis. . . . The evidence . . . simply fails to show that anything [the] defendants did or failed to do caused [the plaintiff's] injuries.

*Id.* at 462, 253 S.E.2d at 308; *see also Bridges v. Shelby Women's Clinic, P.A.*, 72 N.C. App. 15, 323 S.E.2d 372 (1984), *disc. review*

*denied*, 313 N.C. 596, 330 S.E.2d 605 (1985) (holding that where the defendant physicians negligently misdiagnosed the plaintiff's premature labor, but the plaintiff's evidence failed to establish that the defendants could have suppressed her premature labor had they correctly diagnosed the plaintiff sooner, the trial court properly granted a directed verdict against the plaintiff).

Even where a plaintiff has introduced some evidence of a causal connection between the defendant's failure to diagnose or intervene sooner and the plaintiff's poor ultimate medical outcome, our Court has held that such evidence is insufficient if it merely speculates that a causal connection is possible. In *White v. Hunsinger*, 88 N.C. App. 382, 363 S.E.2d 203 (1988), for example, the plaintiff's decedent was injured in an automobile accident. *Id.* at 383, 363 S.E.2d at 204. The defendant physician kept the decedent at the hospital overnight and transferred him to a neurosurgeon at a different hospital the following day. The decedent died shortly thereafter. *Id.* The plaintiff's expert stated in an affidavit that "[the decedent]'s chances of survival would have been increased if he had been transferred to a neurosurgeon earlier." *Id.* at 384, 363 S.E.2d at 205. Our Court affirmed summary judgment for the defendant, holding that the plaintiff's evidence was speculative and insufficient to establish causation:

> [The] plaintiff could not prevail at trial by merely showing that a different course of action would have improved [the decedent]'s chances of survival. Proof of proximate cause in a malpractice case requires more than a showing that a different treatment would have improved the patient's chances of recovery.
>
> . . . .
>
> . . . [The] plaintiff has failed . . . to forecast any evidence showing that had [the defendant] referred [the decedent] to a neurosurgeon when [the decedent] was first brought to the hospital, [the decedent] would not have died. *The connection or causation between the negligence and [injury] must be probable, not merely a remote possibility.*

*Id.* at 386-87, 363 S.E.2d at 206 (emphasis added).

In contrast, our Courts have allowed a plaintiff's evidence to go to a jury where the plaintiff can establish a probable causal connection between the defendant's failure to diagnose or intervene sooner and the plaintiff's poor ultimate medical outcome. In *Turner v. Duke University*, 325 N.C. 152, 381 S.E.2d 706 (1989), for example, the

plaintiff's decedent was admitted to the hospital complaining of constipation, cramping, nausea, and vomiting. *Id.* at 155-56, 381 S.E.2d at 708-09. The defendant physician could not determine the cause of the decedent's symptoms, and treated her for constipation. *Id.* The decedent's condition worsened over the following day, but doctors failed to examine her for a number of hours, at which point she was unresponsive. *Id.* at 156, 381 S.E.2d at 709. Exploratory surgery revealed that the decedent's colon was perforated, and the decedent died of a bacterial infection the following morning. *Id.* at 156-57, 381 S.E.2d at 709. The plaintiff's expert testified at trial that the defendant physician should have examined the decedent sooner, and that his failure to do so was the proximate cause of the decedent's death. *Id.* at 159-60, 381 S.E.2d at 711. The plaintiff's expert explained that if an examination had been performed earlier, the defendant physician should have discovered the decedent's perforated colon and could have performed a life-saving colostomy. *Id.* at 160, 381 S.E.2d at 711. Our Court stated that "[s]uch evidence is the essence of proximate cause," *id.*, and held that the trial court erred in granting a directed verdict against the plaintiff. *Id.* at 162, 381 S.E.2d at 712; *see also Largent v. Acuff*, 69 N.C. App. 439, 443, 317 S.E.2d 111, 113, *disc. review denied*, 312 N.C. 83, 321 S.E.2d 896 (1984) (holding that the plaintiff introduced sufficient causation evidence where the plaintiff's expert testified that if the defendant physician had called a neurosurgeon to examine the plaintiff three days earlier, " 'it is *quite likely* that the patient may have suffered less permanent damage' " (emphasis added)).[3]

### B.

Plaintiff's causation evidence in this case consisted of the deposition testimony of two of Plaintiff's proffered expert witnesses, Dr. Larry Frohman (Dr. Frohman) and Dr. John Leo Grady (Dr. Grady). Both experts offered opinions as to whether Plaintiff would have reached a better ultimate visual outcome had the Beerman and Wake Forest Defendants diagnosed Plaintiff earlier and initiated steroid treatment sooner.

3. Defendants have also cited *Sharpe v. Pugh*, 21 N.C. App. 110, 203 S.E.2d 330 (1974) as controlling authority in this case. The North Carolina Supreme Court affirmed our Court's decision in *Sharpe* by an equally divided vote, with one justice not participating. *See Sharpe v. Pugh*, 286 N.C. 209, 209 S.E.2d 456 (1974) (per curiam) (Bobbitt, C.J., not participating). The Supreme Court's split vote "require[d] that the decision of the Court of Appeals be affirmed without becoming a precedent." *Id.* at 210, 209 S.E.2d at 456-57. Therefore, while *Sharpe* may be persuasive authority in this case, it does not control our decision.

Dr. Frohman testified in his deposition regarding medical research on the effect of steroid therapy on various optical diseases. According to Dr. Frohman, studies have shown that steroid therapy does have some effect on patients who suffer from "typical demyelinating optic neuritis." Specifically, Dr. Frohman testified that early steroid therapy may hasten a patient's recovery, but that steroid therapy has no effect on a patient's ultimate visual outcome. In other words, while a patient who undergoes steroid therapy may reach his or her ultimate visual outcome sooner, that outcome itself remains the same regardless of whether the patient receives steroids.

Dr. Frohman also testified, however, that Plaintiff did not have typical demyelinating optic neuritis, but rather suffered from autoimmune optic neuropathy. According to Dr. Frohman, autoimmune optic neuropathy is "a different disease process" than demyelinating optic neuritis, and is extremely rare. In fact, Dr. Frohman testified that due to the rarity of Plaintiff's disease, researchers had not been able to develop a statistical analysis regarding the effect of steroid treatment on similar patients. Dr. Frohman testified that although any treating ophthalmologist would initiate steroid treatment as soon as possible in the hopes of reaching a better or faster outcome, he was unable to determine whether immediate treatment would affect a patient's long-term prognosis.

With regard to Plaintiff's specific case, Dr. Frohman testified as follows:

[DEFENSE COUNSEL]: Do you intend to offer any testimony in this case that [Plaintiff]'s ability to use his eyes in day-to-day life . . . would have been improved in any way had he been started on treatment a day earlier, a week earlier[,] or two weeks earlier?

[DR. FROHMAN]: . . . . I think that had [Plaintiff] been treated earlier, his outcome in this particular disease could have been better. I can't say that with any measure of statistical significance, because there is no series of this rare disease that can really address that question. Do I think it was standard to treat him earlier, yes. Could I say his outcome would have been better, No.

Dr. Frohman reiterated a number of times throughout his deposition that he could not determine whether earlier steroid treatment would have made a difference in Plaintiff's case, or what type of difference it would have made.

Plaintiff correctly notes that Dr. Frohman did testify in his deposition that "starting [patients] on day one, day two, day three, day four, day five makes a difference." It is true that Dr. Frohman's statement, taken in isolation, appears to suggest that a causal connection exists between early steroid treatment and a patient's ultimate visual outcome. However, it is clear from the full context of Dr. Frohman's testimony that Plaintiff has misinterpreted Dr. Frohman's remarks:

[DEFENSE COUNSEL]: [Is there] data which would allow [experts] to offer an opinion as to what difference, if any, treatment would have made?

. . . .

[DR. FROHMAN]: . . . [T]he disease is too small in number, too rare, for anyone to develop a series that [is] large enough to do the study and develop statistical analysis. . . . [H]ow [should we] do such a study[?] The patient is blind, in this case, in both eyes. What we're going to do is randomize a group that doesn't get sham therapy or sham studies[?] [It is] [a]n unethical study to do. When you're faced with someone who is seriously blind in both eyes, you have to treat them with what you think is best.

[DEFENSE COUNSEL]: And some of them get better and some of them do not?

[DR. FROHMAN]: Right. And there is not enough data to see who will.

[DEFENSE COUNSEL]: Who will or who won't?

[DR. FROHMAN]: And starting them on day one, day two, day three, day four, day five makes a difference.

[DEFENSE COUNSEL]: No further questions.

The full text of Dr. Frohman's testimony demonstrates that Dr. Frohman was merely stating that in order to develop statistics regarding the effect of early steroid treatment, physicians involved in such research would have to administer steroid treatment to different patients at different stages of disease development. In other words, for the purposes of conducting a research study, starting treatment "on day one, day two, day three, day four, day five makes a difference" in terms of gathering helpful data on the efficacy of early treatment. However, according to Dr. Frohman, this type of data does not exist because the disease at issue is so rare, and because a study pro-

ducing such research would be unethical. Such testimony does not establish a causal connection between early treatment and better ultimate visual outcome.

Like Dr. Frohman, Dr. Grady also testified in his deposition that had Plaintiff been treated earlier, there is "no scientific basis to say that the long-term outcome for [Plaintiff] would be any different[.]" Dr. Grady did believe that, as with typical demyelinating optic neuritis, patients with autoimmune optic neuropathy may achieve a faster recovery when treated with steroids. However, Dr. Grady also maintained that he was unable to determine whether and to what extent earlier treatment would have affected Plaintiff's final visual outcome:

> [DEFENSE COUNSEL]: In [Plaintiff]'s case, do you intend to offer any opinion that as of December 20, 2002, that there was treatment that would have influenced the outcome, had it been provided on that date?
>
> . . . .
>
> [DR. GRADY]: Well, given what we know now, probably, yeah.
>
> [DEFENSE COUNSEL]: You say—
>
> [DR. GRADY]: Well, influence the outcome at least in terms of the rapidity of any improvement that may have occurred.
>
> [DEFENSE COUNSEL]: . . . [E]ven had treatment been rendered on December 20, 2002 . . . [Plaintiff]'s condition today, several years out, would not be substantially different; correct?
>
> [DR. GRADY]: Well, I don't think we can say that. We can't know what the outcome might have been. That is not knowable. . . .
>
> [DEFENSE COUNSEL]: And that's because there's no scientific proof that had [Plaintiff been treated] on December 20, 2002, that the long-term outcome would be any different than nontreatment; correct?
>
> [DR. GRADY]: That's correct. There's no scientific proof that treatment at that time would have made a difference in the final outcome.

Dr. Grady repeatedly stated throughout his deposition that while earlier initiation of steroid treatment may have hastened Plaintiff's recovery, there was no way to determine whether it would have improved Plaintiff's ultimate visual outcome. Dr. Grady did testify

that earlier steroid intervention "perhaps" could have led to "a fuller recovery," and that Plaintiff's eyesight "may have been improved to a better outcome." However, Dr. Grady quickly qualified his statement by admitting that "any attempt to testify [as to] what improvement might have been obtained[,] and when[,] would amount to sheer speculation[.]"

We hold that Plaintiff's evidence was insufficient to establish the requisite causal connection between Defendants' alleged negligence and Plaintiff's blindness. Neither of Plaintiff's expert witnesses were able to testify that Plaintiff's vision would be better today had Defendants initiated steroid treatment sooner, nor were they able to testify that Plaintiff's vision *probably* would be better. *Cf. Acuff*, 69 N.C. App. at 443, 317 S.E.2d at 113 (finding sufficient evidence of proximate cause where the plaintiff's expert testified that earlier intervention "quite likely" would have improved the plaintiff's ultimate outcome). Rather, Plaintiff's expert witnesses consistently testified that they were unable to determine whether earlier treatment would have had any effect on Plaintiff's ultimate visual outcome, or what that effect might have been. Such testimony is insufficient to establish proximate cause in a medical malpractice case. *See Lindsey*, 40 N.C. App. at 462, 253 S.E.2d at 308 (finding insufficient evidence of proximate cause where the plaintiff introduced no evidence showing that if the defendants had intervened earlier, the plaintiff would have achieved a different ultimate medical outcome).

At best, Plaintiff can point to Dr. Frohman's testimony that with earlier treatment, Plaintiff's "outcome in this particular disease could have been better," and Dr. Grady's testimony that earlier steroid intervention "perhaps" could have led to "a fuller recovery." Such evidence does not establish that "[t]he connection or causation between [Defendants' alleged] negligence and [Plaintiff's injury was] *probable*, not merely a remote possibility." *White*, 88 N.C. App. at 387, 363 S.E.2d at 206 (emphasis added). This is especially true given that both Dr. Frohman and Dr. Grady qualified their statements by stressing that while a different outcome might have been possible, it would be speculative to offer an opinion as to whether a different outcome could have been achieved in Plaintiff's case and what that outcome might have been. *See Young v. Hickory Bus. Furn.*, 353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000) (stating that " 'could' or 'might' expert testimony [is] insufficient to support a causal connection when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation").

*STARR v. GASTON CTY. BD. OF EDUC.*

[191 N.C. App. 301 (2008)]

Plaintiff stresses that "proximate cause is normally a question best answered by the jury." *Leatherwood v. Ehlinger*, 151 N.C. App. 15, 24, 564 S.E.2d 883, 889 (2002), *disc. review denied*, 357 N.C. 164, 580 S.E.2d 368 (2003). While we agree with Plaintiff's contention, "[P]laintiff must nevertheless provide a sufficient forecast of evidence to justify presentment to the jury." *Kenyon v. Gehrig*, 183 N.C. App. 455, 457-58, 645 S.E.2d 125, 127 (2007), *disc. review denied*, 362 N.C. 176, 658 S.E.2d 272 (2008). Plaintiff has not met his burden in this case. We therefore hold that the trial court did not err in granting the Beerman and Wake Forest Defendants' motions for summary judgment.

Given our holding on the issues discussed above, we need not address Plaintiff's remaining assignments of error.

Affirmed.

Judges STEELMAN and GEER concur.