AJAMU GAINES, JR., A MINOR, BY AND THROUGH HIS GUARDIAN AD LITEM, SCOTT HANCOX; AND AJAMU GAINES, SR., PLAINTIFFS v. CUMBERLAND COUNTY HOSPITAL SYSTEM, INC., A/K/A CAPE FEAR VALLEY HEALTH SYSTEM AND/OR CAPE FEAR VALLEY MEDICAL CENTER; CAPE FEAR ORTHOPAEDIC CLINIC, P.A.; KAREN V. JONES, M.D.; THOMAS R. TETZLAFF, M.D.; AND JOHNNY KEGLER, A/K/A JASON WILLIS, CAROLINA REGIONAL RADIOLOGY, P.A.; AND BEVERLY A. DAVIS, M.D., DEFENDANTS

No. COA07-1419-2

(Filed 6 April 2010)

## 1. Medical Malpractice— failure to detect child abuse—hospital employees—issue of fact

Summary judgment was incorrectly granted for defendant Cape Fear Valley on a claim that its employees failed to detect signs of child abuse which proximately caused a subsequent

injury. There was an issue of fact in that plaintiffs submitted evidence from a doctor and a nurse asserting that defendant's employees breached the standard of care while a DSS investigator testified that no investigation would have followed a report from defendant's employees.

**2. Medical Malpractice— failure to detect child abuse—radiologist—summary judgment**

Plaintiffs forecasted sufficient evidence against defendants Dr. Davis and Regional Radiology to withstand summary judgment in a medical malpractice claim arising from the failure to detect child abuse and a subsequent injury. Dr. Davis did not notify DSS of potential child abuse or inform any other physician or nurse about the suspicious findings.

**3. Medical Malpractice— failure to detect child abuse—not reviewing x-ray report or personally taking history**

Plaintiffs forecasted sufficient evidence against Dr. Tetzlaff to withstand summary judgment on a medical malpractice claim arising from the failure to detect child abuse. There was evidence that Dr. Tetzlaff did not review an x-ray report and did not personally take a history.

**4. Medical Malpractice— failure to detect child abuse— follow-up visits**

Plaintiffs forecasted sufficient evidence against Dr. Jones and Cape Fear Orthopaedic Clinic to withstand summary judgment in a medical malpractice action claiming that failure to detect child abuse led to further injuries. These defendants were the medical providers who saw the child during four follow-up visits.

**5. Medical Malpractice— failure to detect child abuse—testimony not speculative**

The expert testimony in a medical malpractice case arising from the failure to detect child abuse was based on facts rather than speculation and, viewed in the light most favorable to plaintiffs, was sufficient to withstand summary judgment. Testimony about what DSS would have done had a report been made earlier came from a physician with a long-standing relationship to DSS and expertise in its policies.

Appeal by plaintiffs from judgment entered 17 April 2007 by Judge Ola M. Lewis in Cumberland County Superior Court. Petition for Rehearing granted 24 April 2009.

*Faison & Gillespie, by Reginald B. Gillespie, Jr.; and Conley Griggs, LLP, by Cale H. Conley and Richard A. Griggs, Atlanta, Georgia, pro hac vice; and William S. Britt, for plaintiffs-appellants.*

*Cranfill, Sumner & Hartzog, LLP, by Norwood P. Blanchard, III, John D. Martin, and Katherine C. Wagner, for defendant-appellee Thomas R. Tetzlaff, M.D.*

*McGuire Woods, LLP, by Mark E. Anderson and Monica E. Webb for defendant-appellee Cumberland County Hospital System, Inc.*

*Manning, Fulton & Skinner, PA, by Robert S. Shields, Jr. and Katherine M. Bulfer, for defendants-appellees Beverly A. Davis, M.D. and Carolina Regional Radiology, P.A.*

*Ellis & Winters, LLP, by Alex J. Hagan and Alexander M. Pearce, for defendants-appellees Cape Fear Orthopaedic Clinic, P.A. and Karen V. Jones, M.D.*

HUNTER, Robert C., Judge.

This case was originally decided 17 February 2009. *See Gaines ex rel. Hancox v. Cumberland County Hosp. System, Inc.,* —— N.C. App. ——, 672 S.E.2d 713 (2009). On 24 April 2009, Plaintiffs' Petition for Rehearing was granted. After careful review upon rehearing, we find that, at the summary judgment stage, plaintiffs forecasted sufficient evidence to create a genuine issues of material fact as to whether defendants breached the standard of care, and whether that breach was a proximate cause of the minor plaintiff's subsequent brain injury. Accordingly, defendants' motion for summary judgment was improperly granted.

On 1 September 2005, plaintiffs Ajamu Gaines, Sr. and Ajamu Gaines, Jr. ("Ajamu"), through his guardian ad litem, filed a complaint against defendants Cumberland County Hospital System, Inc., a/k/a Cape Fear Valley Health System and/or Cape Fear Valley Medical Center ("CFVMC"); Cape Fear Orthopaedic Clinic, P.A. ("Cape Fear Orthopaedic Clinic"); Karen Jones, M.D. ("Dr. Jones"); Thomas R. Tetzlaff, M.D. ("Dr. Tetzlaff"); and Johnny Kegler ("Kegler"), a/k/a Jason Willis.

On 12 April 2006, plaintiffs filed an amended complaint, adding claims against Carolina Regional Radiology, P.A. ("Regional Radi-

ology") and Beverly A. Davis, M.D. ("Dr. Davis"). Plaintiffs alleged that defendants were negligent in that they "failed to discover or diagnose . . . prior abuse and/or neglect of Ajamu Gaines, Jr., despite the availability of existing evidence that would give rise to a suspicion of such abuse and neglect[.]" Plaintiffs further asserted that there was a causal link between defendants' alleged negligence and Ajamu's injuries. On 30-31 January 2007, all defendants, except Kegler, filed motions for summary judgment, which were presented as "one joint motion from all defendants."

An order granting the motion for summary judgment was entered 17 April 2007, concluding that "there is no genuine issue as to any material fact . . . and that the moving defendants are entitled to judgment as a matter of law." Plaintiffs timely appealed to this Court.

## I. Background

On 15 April 2003, Ajamu arrived at CFVMC with a wrist injury. Ajamu claimed that the injury occurred when he jumped off the porch of his house; however, there was some discrepancy in his story as to whether he jumped or fell off the porch. After x-rays were performed, Ajamu was diagnosed with "100% displaced right distal radius and ulnar metaphyseal fractures." Dr. Jones, who was employed by Cape Fear Orthopaedic Clinic, was listed as Ajamu's attending physician and upon examination of Ajamu's wrist, she recommended surgery to repair the fractured bones.

During surgery, Ajamu vomited. Due to a possibility that Ajamu could develop aspiration pneumonia, Dr. Jones ordered a chest x-ray. Dr. Davis, who was employed by Regional Radiology, examined the chest x-ray and noted in her report that there was an "old fracture deformity left posterolateral 9th rib." The report was verified by Dr. Davis at 12:42 a.m. on 16 April 2003, and the report was immediately available for other physicians to review through the hospital's computer system.

Dr. Jones then saw Ajamu at 8:00 a.m. on 16 April 2003, but she had not yet read the chest x-ray report. Dr. Jones cleared Ajamu for release contingent upon the results of a pediatric consultation. Dr. Tetzlaff, a pediatrician, performed this consultation at approximately 9:20 a.m. on 16 April 2003. After a brief physical examination, Dr. Tetzlaff ordered a second chest x-ray. Nurse Practitioner Cinthia Fletcher obtained a history and performed an examination of Ajamu outside the presence of Dr. Tetzlaff. She noted, "[t]his is a 6-year-old who was playing at home, jumped off the porch, and one of his shoes

came off and he tripped over the steps and fell on his arm." This account by Ajamu constituted a third variation since his arrival at the hospital. Dr. Tetzlaff did not review or sign the consult note. Dr. Tetzlaff did not review the chest x-ray or read the report of Dr. Davis, but saw a note by Dr. Shaider, an anesthesiologist, that the x-ray of the lungs was "clear[.]" The second x-ray report showed that the lungs were clear and did not mention the old rib fracture. Plaintiffs presented evidence that the results of the second x-ray were not available for review until 3:00 p.m. and Dr. Tetzlaff released Ajamu from the hospital at 2:40 p.m., which indicates that Dr. Tetzlaff did not review the second chest x-ray report that he ordered. Upon Ajamu's discharge, Dr. Tetzlaff advised Ajamu's mother to follow up with Dr. Jones at Cape Fear Orthopaedic Clinic. Ajamu's chart at CFVMC contained a primary diagnosis, which was the wrist fracture, and a secondary diagnosis, "[f]alling from residential premise, undetermined if accident/purposely inflicted."

Ajamu saw Dr. Jones for four follow-up appointments between 23 April and 23 June 2003. None of Ajamu's physicians reported any suspicion of child abuse to the Department of Social Services ("DSS"). On 3 July 2003, Ajamu returned to CFVMC after suffering a traumatic head injury. Despite the fact that a pediatric admission assessment was filled out that day indicating potential child abuse, DSS was not contacted until after Dr. Sharon Cooper ("Dr. Cooper") examined Ajamu on 10 July 2003. Dr. Cooper, an expert witness for plaintiffs, is a pediatrician in Fayetteville with privileges at CFVMC. A skeletal survey of Ajamu was ordered on 10 July 2003, which revealed three other rib fractures, in addition to the 9th rib fracture previously identified on 16 April 2003 by Dr. Davis.

Dr. Cooper testified that 56 total injuries were present in July 2003 when Ajamu arrived at the hospital with severe head trauma. Dr. Cooper testified that the following injuries were, more likely than not, present in April 2003 when Ajamu came to the hospital with a wrist fracture, which should have resulted in suspicion of child abuse and a report to DSS.

1. Torn and healed upper frenulum

2. Deformation of right wrist (old fracture of right radius and ulna)

3. Three older deep scars over right nasolabial region.

4. Scar on chest at 3rd rib line

5. Gauge [sic] mark on right elbow

6. Linear scar medial to right scapula

7. Linear scar medial to left scapula

8. Curvilinear scar on mid thorax

9. Linear scar beneath left buttocks

10. Bruise on left thigh

11. Fracture of 9th rib

12. Fracture of 11th left rib

13. Fracture of 11th right rib

A DSS investigation resulted in the arrest of Kegler, the boyfriend of Ajamu's mother, for child abuse. Kegler had an outstanding warrant against him for other criminal activity. Due to the injuries inflicted by Kegler, Ajamu is now a quadriplegic and has permanent brain damage.

## II. Standard of Review

The law is clear with regard to the trial court's review of a motion for summary judgment and the standard of review for this Court:

> A trial court should grant a motion for summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. The moving party carries the burden of establishing the lack of any triable issue. The movant may meet his or her burden by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim. All inferences of fact must be drawn against the movant and in favor of the nonmovant.

*Lord v. Beerman*, 191 N.C. App. 290, 293, 664 S.E.2d 331, 334 (2008) (internal citations and quotation marks omitted) (alteration omitted). "We review a trial court's grant of summary judgment *de novo.*" *Id.*

"To survive a motion for summary judgment in a medical malpractice action, a plaintiff must forecast evidence demonstrating 'that the treatment administered by [the] defendant was in negligent viola-

tion of the accepted standard of medical care in the community[,] and that [the] defendant's treatment proximately caused the injury.' " *Id.* at 293-94, 664 S.E.2d at 334 (quoting *Ballenger v. Crowell*, 38 N.C. App. 50, 54, 247 S.E.2d 287, 291 (1978)).

While defendants argue that the standard of care was not breached, the crux of this case is whether any breach by defendants was a proximate cause of Ajamu's brain injury.

> Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

*Hairston v. Alexander Tank & Equipment Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984).

"[I]t is only in exceptional cases, in which reasonable minds cannot differ as to foreseeability of injury, that a court should decide proximate cause as a matter of law. Proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." *Williams v. Power & Light Co.*, 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979) (citation and quotation marks omitted). "Causation is an inference of fact to be drawn from other facts and circumstances." *Turner v. Duke University*, 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989).

"In a medical negligence case, '[t]he connection or causation between the negligence and [injury] must be probable, not merely a remote possibility.' " *Azar v. Presbyterian Hosp.*, 191 N.C. App. 367, 371, 663 S.E.2d 450, 453 (2008) (quoting *White v. Hunsinger*, 88 N.C. App. 382, 387, 363 S.E.2d 203, 206 (1988)), *cert. denied*, 363 N.C. 372, 678 S.E.2d 232 (2009). "Our courts rely on medical experts to show medical causation. . . . When this testimony is based merely upon speculation and conjecture, however, it is no different than a layman's opinion, and as such, is not sufficiently reliable to be considered competent evidence on issues of medical causation." *Id.* (internal citation omitted). We will now review the evidence presented in the light most favorable to plaintiffs as it pertains to each defendant.

### III.  Standard of Care & Proximate Cause Testimony

#### A.  Cumberland County Hospital System, Inc., a/k/a Cape Fear Valley Health System and/or Cape Fear Valley Medical Center

[1] Plaintiffs allege that the employees of CFVMC, including physicians and nursing staff, failed to detect present signs of child abuse in April 2003, which was a breach of the standard of care and was a proximate cause of Ajamu's subsequent injury.[1]

CFVMC had policies in place in April 2003 regarding potential child abuse. At that time, CFVMC had a specific administrative policy on "Child Maltreatment," which stated that CFVMC staff "are expected to report cases in which there is a reasonable cause to believe that a child has been a victim of maltreatment and/or may be in need of protective services," and that "maltreatment prevention is a significant component of the hospital mission." The policy included "fractures" as a common example of physical abuse. In April 2003, CFVMC utilized a "Pediatric Admission Assessment" form, which included a specific "abuse/neglect screen" section. The indicators to be considered included "multiple injuries in various stages of healing," "inappropriate injury or degree of injury versus history," and "conflicting histories of injury." The record reveals that in April 2003, CFVMC did not conduct an abuse/neglect screen when Ajamu was admitted.

Plaintiffs submitted a signed affidavit by Nurse Beatrice Yorker ("Nurse Yorker"), in which she asserts that the nurses of CFVMC did not comply with the standard of care in this case, in part because of their failure to perform a complete Pediatric Admission Assessment form. Nurse Yorker listed several other breaches of the standard of care by the nurses at CFVMC and asserts that these breaches were a proximate cause of Ajamu's injuries. Nurse Yorker was also deposed and testified consistent with her affidavit.

Dr. Cooper also testified as to CFVMC's breach of the standard of care. At her deposition, the following dialogue took place:

Q. Is it your opinion that the hospital did anything in this case that was not up to that standard o[f] care?

---

1. Defendants Dr. Davis, Dr. Jones, and Dr. Tetzlaff were sued in their individual capacities, but these physicians also had privileges to practice at CFVMC. Plaintiffs allege that the hospital is jointly and severally liable due to the negligence of its physicians and staff.

A. I feel that the standard of care was not met in this particular case.

Q. Tell me in which ways you think the standard of care was not met by the hospital or its employees.

A. This—the standard of care was not met in this particular case because first of all the child—non-accidental trauma should always be considered when a child comes in with a significant injury. Fractures are significant injuries. Second of all, when you have the presence of new and old injuries, particularly fracture injuries, a more thorough evaluation should be pursued. Third, health care providers, particularly in a hospital setting, but all health care providers, are mandated reporters to child protective services of suspected child abuse. There must be an index of suspicion. You don't have to know for sure that abuse has occurred. And if a suspected child abuse is not reported to DSS by hospital personnel, and it could have been reported by any personnel, it doesn't have to have been the primary care physician or the anesthesiologist, it can be any health care provider in the—in the hospital setting. If that does not happen, the child is at risk for subsequent further injury. The fourth point is that the standard of care is that if you order tests, you should review those tests, preferably before the patient is discharged from the hospital . . . .

Dr. Cooper went on to state that the physicians of CFVMC did not properly acknowledge the 9th rib fracture, an indicator of child abuse, particularly when coupled with a new injury. She also stated that the emergency department did not take a thorough history of Ajamu. She further claimed that the standard of care was breached by the hospital's failure to properly screen Ajamu under the hospital's child maltreatment policy, which she helped formulate.

With regard to proximate cause, Dr. Cooper testified: "I also feel very strongly that Ajamu would not be like he is today had we [the physicians and staff of CFVMC] done our job appropriately in April of 2003." Dr. Cooper also testified that defendants' negligence "clearly contribut[ed] as [] a proximate cause to the ultimate outcome of this catastrophic head trauma injury . . . ." Dr. Cooper testified at length concerning DSS involvement, which supports the notion that had the hospital properly notified DSS, Ajamu would have been removed from the home and the injury would not have occurred:

Q. How do we know that steps would have been taken to prevent these subsequent injuries without speculating?

A. Okay. This case, if I could use a colloquial expression, it's somewhat of a no-brainer of a case in the sense that had a report been made in April . . . DSS would have gone to the home. The first thing that DSS routinely does when they begin to talk to parents where a report has been initiated is they do a background check. They would have immediately found out that Mr. Kegler was a fugitive from justice. That would have been the first thing that would have become evident. . . . Knowing that this man had warrants out for his arrest in several different states, had an alias and was living in this home would have put a stop right away for DSS allowing him to have care of these children subsequently.

Q. And what's the basis for that opinion?

A. That's my experience with DSS and also the fact that I teach DSS and have been an instructor for DSS for several years.

Each defendant argues that Dr. Cooper's testimony is speculative, particularly with regard to what DSS would have done. However, Dr. Cooper has extensive experience working with and instructing DSS on child abuse matters, as evidenced by her testimony and curriculum vitae.[2] Dr. Cooper testified:

Q. How do you know how DSS works?

A. Because fortunately Cumberland County and Harnett County and the Cape Fear region have not [sic] huge Child Protective Services agencies and departments. And I would have to tell you I know almost every single DSS worker—investigative worker for Child Protective Services. I certainly know all of the supervisors and I'm very good friends with the overall

---

2. It does not appear from the record that defendants ever challenged Dr. Cooper's credentials or qualifications as an expert at the trial court. However, we note that it is well established that "a person is not permitted to offer expert testimony on the appropriate *standard of care* unless he qualifies under the provisions of Rule 702(b)(2) of the Rules of Evidence." *Andrews v. Carr*, 135 N.C. App. 463, 469, 521 S.E.2d 269, 273 (1999) (emphasis added), *disc. review denied*, 351 N.C. 471, 543 S.E.2d 483 (2000). When the expert testimony pertains to *causation*, the testimony is competent "as long as the testimony is helpful to the jury and based sufficiently on information reasonably relied upon under Rule 703[.]" *Johnson v. Piggly Wiggly of Pinetops, Inc.*, 156 N.C. App. 42, 49, 575 S.E.2d 797, 802, *disc. review denied*, 357 N.C. 251, 582 S.E.2d 271 (2003).

director of DSS. But in addition to my knowing these individuals and working with them one-on-one on a weekly basis, I also have interacted with DSS as a trainer . . . numerous times either directly through DSS upon their request or else through our child advocacy center which sets up trainings for DSS workers and I'm one of the trainers that they typically will call in to provide trainings both through our child advocacy directive in Chapel Hill.

Q. From that experience have you gained understanding and personal knowledge of when they take steps like running a background check or . . . interviewing parents or like visiting the home or to observe what's present or like putting a Protection Plan in place?

A. Yes. That's why I know that DSS and the sheriff's department or the police department work hand-in-hand because DSS cannot do an NCIC background check and that's why I have the sheriff's department to do that. And of course, the sheriff's department is typically notified at the same time DSS finds out about a possible child abuse case because usually there's a criminal action that takes place, so that's another—that's another team. I'm frequently a part of that team . . . .

Defendants in this case point to the testimony of DSS investigator Rosemary Zimmerman ("Zimmerman"), who claimed that had a report been made, DSS would not have investigated because "there's no medical documentation that this injury was non-accidental . . . [and] there's no disclosure by the people that were interviewed of any suspicion of neglect, any knowledge of neglect or abuse." However, Zimmerman's testimony does not completely negate Dr. Cooper's testimony to the contrary. The jury as the finder of fact is charged with weighing the evidence and deciding credibility. *See Smith v. Price*, 315 N.C. 523, 530-31, 340 S.E.2d 408, 413 (1986) (Explaining that as the finder of fact, the jury is "entitled to draw its own conclusions about the credibility of the witnesses and the weight to accord the evidence."). Moreover, the fact that there was competing testimony creates an issue of material fact for the jury to consider.

In sum, we find that plaintiffs forecasted sufficient evidence against defendant CFVMC to withstand summary judgment and that genuine issues of material fact exist with regard to the liability of this defendant.

## B. Dr. Davis and Carolina Regional Radiology, P.A.

[2] Plaintiffs allege that Dr. Davis, being aware of the wrist fracture and having reported the 9th rib fracture on the first x-ray report on 16 April 2003, *should have notified DSS of potential child abuse.*[3] Not only did she not notify DSS, she did not verbally inform any other physician or nurse about the suspicious findings. Dr. Ronald Friedman ("Dr. Friedman") submitted an affidavit in which he stated, *inter alia*:

> It is my opinion that the combination of wrist and rib fractures . . . which are recorded in radiology reports by Dr. Davis . . . and which are apparent on the X-Ray films of Ajamu Gaines, Jr. . . . are unusual and suspicious for a six-year-old pediatric patient. It is my opinion that the presence of those two fractures, in combination, were, and should have been to Dr. Davis under the applicable standard of care, indicative of potential non-accidental trauma . . . in a manner sufficient to have given Dr. Davis cause to suspect child abuse or child maltreatment . . . .

Dr. Friedman went on to say that the applicable standard of care required Dr. Davis to "not only note those findings on her radiology reports, but also to call, meet with, communicate with or otherwise highlight directly to the attending physician . . . the presence of a combination of radiological findings giving cause to suspect child abuse or child maltreatment . . . ."

Dr. Friedman also claimed that had Dr. Davis not breached the standard of care, authorities could have been notified "so that further investigation could have been conducted . . . to take steps to protect Ajamu Gaines, Jr. from a return to the dangerous residential environment where he subsequently suffered a massive head and brain injury . . . ." Dr. Friedman testified to this effect in his deposition. Again, Dr. Cooper testified as to the actions she believed, in her experience, DSS would have taken to remove Ajamu from the home.

In sum, we find that plaintiffs forecasted sufficient evidence against defendants Dr. Davis and Regional Radiology to withstand summary judgment and that genuine issues of material fact exist.

## C. Dr. Tetzlaff

[3] Plaintiffs claim that Dr. Tetzlaff failed to review the first x-ray report, which would have made him aware of the old rib fracture, and failed to personally take a history of Ajamu.

3. Plaintiffs claim that Carolina Regional Radiology, P.A. is jointly and severally liable due to the negligent actions of its employee, Dr. Davis.

Dr. Randell Alexander ("Dr. Alexander") submitted an affidavit stating, *inter alia*:

> On April 15-16, 2003, Dr. Tetzlaff failed to properly analyze, appreciate, investigate, diagnose or properly document a discrepancy between the actual injury to Ajamu Gaines, Jr. . . . and the reported history of a fall from a porch, even though the noted fracture was not a compressional or "telescoping" type fracture which is the type of fracture normally associated with falls such as the one reported, and as a result he failed to undertake a full and proper investigation . . . of whether Ajamu Gaines, Jr. had been a victim of child abuse and/or was living in a dangerous residential environment from which he may need to be protected or removed to prevent foreseeable future harm[.]

Dr. Alexander also claimed that Dr. Tetzlaff breached the standard of care by failing to view the first x-ray report, which contained notice of the 9th rib fracture. He further stated: "It is my professional opinion that Dr. Tetzlaff's deviations from the standard of care were a proximate cause of Ajamu Gaines, Jr.'s injuries." While Dr. Alexander does not have experience working with DSS in order to know what DSS would have done, Dr. Cooper's testimony on that point is competent. Dr. Alexander was deposed and testified to this effect, though at one point he indicated that the standard of care did not require Dr. Tetzlaff to view the first x-ray where the second x-ray was clear. This potential inconsistency does not render the testimony insufficient or void the affidavit; however, at trial such an inconsistent statement can be brought forward. *See Bost v. Riley*, 44 N.C. App. 638, 642, 262 S.E.2d 391, 393 (1980) ("Under our rules of evidence, prior inconsistent statements of a physician are admissible to impeach his testimony.").

Dr. Cooper also testified that Dr. Tetzlaff and his team breached the standard of care. She stated that "the standard of care would have been for [Dr. Tetzlaff] to have read the [first] radiology report." "Dr. Tetzlaff not knowing about the old rib fracture, I'm afraid was an untenable circumstance because he had the opportunity to know about the old rib fracture." Additionally, Dr. Cooper was asked: "Is it your opinion that the standard of care required Dr. Tetzlaff who was called in for the purposes of a consult for aspiration pneumonia to again ask the mother and the child about the history of the injury?" She responded: "Yes. Because if you are a health care provider, for whatever reason you're brought in to see the patient . . . you should

always . . . take a complete history . . . ." The record shows that Dr. Tetzlaff's physician assistant did take a history, but plaintiffs allege that Dr. Tetzlaff breached the standard of care because he was not present when the history was taken, nor did he review or sign the history report.

In sum, we find that plaintiffs forecasted sufficient evidence against defendant Dr. Tetzlaff to withstand summary judgment and that genuine issues of material fact exist.

### D. Dr. Jones and Cape Fear Orthopaedic Clinic, P.A.

[4] Plaintiffs allege that during the four follow-up visits with Dr. Jones there is no indication that Dr. Jones or any employee of Cape Fear Orthopaedic Clinic (1) obtained or reviewed the 16 April radiology report showing an old rib fracture; (2) documented physical signs of potential child abuse; (3) investigated further the "secondary diagnosis" from CFVMC that it was undetermined whether Ajamu's wrist injury was accidental or purposely inflicted; (4) ordered a skeletal survey of Ajamu's body; (5) consulted a forensic pediatrician with child abuse experience; or (6) questioned that Ajamu's splint was in disrepair after "apparently [being] tripped" just a week after reportedly falling or jumping off a porch.[4]

Dr. Cooper did not testify as to the standard of care applicable to these defendants. Dr. Errol Mortimer ("Dr. Mortimer") submitted an affidavit listing multiple breaches of the standard of care. At his deposition, Dr. Mortimer testified that, *inter alia*, Dr. Jones breached the standard of care because she failed to "[i]nform[] herself of the results of the [first] chest x-ray." He stated: "It's my opinion that if she did know of the results of that x-ray, then it would have been her responsibility to act on it, namely to contact a child protection serv-ice or the Department of Social Services or whoever the immediate party or parties are who assume responsibility for the investigation of a child who is suspected of having been neglected or abused." He also claimed that the physician's assistants were responsible "for being aware of the chest x-ray result." While Dr. Mortimer admitted it would be speculation for him to state what DSS would have done, Dr. Cooper's testimony is sufficient as to that issue.

---

4. Plaintiffs claim that Cape Fear Orthopaedic Clinic, P.A. is jointly and severally liable due to the negligent actions of its employee, Dr. Jones, and other healthcare personnel.

In her affidavit Nurse Yorker stated that, *inter alia*:

[T]he nurses and nursing staff at Cape Fear Orthopaedic Clinic failed to properly evaluate and assess the physical condition, medical history and all relevant circumstances pertaining to Ajamu Gaines, Jr., even after he had an X-Ray report showing an old fracture . . . and even after [he] presented with a history of being "tripped" only a week after his prior visit to Cape Fear Valley Medical Center, and/or failed to bring to the attention of the physicians or other health care providers at Cape Fear Orthopaedic Clinic the need for such a full and complete evaluation of Ajamu Gaines, Jr.[]

She claimed that the multiple breaches of the standard of care "were a direct and proximate cause of Ajamu Gaines, Jr.'s injuries."

In sum, we find that plaintiffs forecasted sufficient evidence against Dr. Jones and Cape Fear Orthopaedic Clinic to withstand summary judgment and that genuine issues of material fact exist.

### IV. Application of the Evidence

[5] Defendants claim that the expert testimony in this case is speculative and that proximate cause is based on a series of unsubstantiated inferences; however, "[c]ausation is an inference of fact to be drawn from other facts and circumstances." *Turner*, 325 N.C. at 162, 381 S.E.2d at 712. In reviewing the whole record, we find that the evidence in this case is based on facts, i.e., the documented medical records and the experts' specific knowledge regarding the standard of care and proximate cause. At trial, the jury will determine whether defendants' actions constituted a breach of the standard of care and proximately caused Ajamu's injury. At the summary judgment stage, we must view the evidence in the light most favorable to plaintiffs, and in so doing, we find that plaintiffs forecasted sufficient evidence to withstand summary judgment.

A key fact in this case, which bolsters plaintiffs' proximate cause argument, is that Kegler had an outstanding warrant against him in April 2003 and was living under a false name. As plaintiffs argue, had the physicians properly recognized the suspicious nature of Ajamu's wrist injury, coupled with the old rib fracture, DSS would have been notified and would likely have had a background check run on Kegler. Dr. Cooper testified in support of this argument, stating that "the sheriff's department is typically notified at the same time DSS finds out about a possible child abuse case" and a background check is run.

In July 2003, the background check revealed the outstanding warrant against Kegler.

While there is no case law on point in North Carolina, defendants cite to the case of *Chapa v. United States*, 497 F.3d 883 (8th Cir. 2007), which actually supports plaintiffs' claims. In *Chapa*, the minor child, Dakota, was treated at Ehrling Bergquist Hospital (the "Hospital") on six occasions between his birth on 3 August 2001 and 2 December 2001. *Id.* at 885.

> On September 25, 2001, Dakota's parents brought him to the emergency department at Bergquist after his mother accidentally gave him a ten-fold overdose of Sudafed. Dr. Lyle J. Vander-Schaaf called the poison control center, observed Dakota for two hours, and released him to his parents. On October 5, 2001, Dakota's parents took him for a routine, well-baby check-up. Nurse Practitioner Lynn Murphy inquired as to the cause of a small bruise on Dakota's forehead. His parents stated that most likely a toddler at Dakota's daycare inflicted the bruise. On October 12, 2001, Dakota's father brought him to the emergency department, claiming that he had jerked Dakota by the left arm while trying to lift him. Dr. Garri diagnosed Dakota with "nursemaid's elbow." Dakota's father told Dr. Garri that Dakota had no medical history, and Dr. Garri did not request Dakota's medical records. After an x-ray of Dakota's left arm did not detect any fractures, Dr. Garri released Dakota to his father.

*Id.* at 885-86. On 2 December 2001, Dakota was again brought to the hospital and was diagnosed with " 'shaken-baby syndrome,' " and subsequently with "severe permanent brain damage, blindness and seizures." *Id.* at 886.

> During a bench trial, Dr. John A. Tilelli, the Chapas' expert medical witness, testified that, in his opinion, the care provided during all three of Dakota's visits to Bergquist before the December 2, 2001 incident fell below the generally recognized medical standard of care. Specifically, with respect to the treatment by Dr. Garri, Dr. Tilelli testified that all medical practitioners have a duty to review all medical data available to them, and Dr. Garri deviated from this medical standard of care.

*Id.* The district court found that the medical personnel of the hospital complied with the standard of care, but that Dr. Garri, the treating physician, did not comply with the standard of care because he

failed to review Dakota's medical records. *Id.* at 887. "Given the ready accessibility of the records and the nature of the injury for which Dr. Garri treated Dakota [in October 2001], the district court found that Dr. Garri deviated from the medical standard of care in that respect." *Id.* However, the court found that there was insufficient evidence to prove that Dr. Garri's failure to review the medical records, and report the October 2001 incident, proximately caused the December 2001 injury. *Id.* at 889. The 8th Circuit Court of Appeals upheld the lower court and stated,

> While Dr. Tilelli did testify about what he believed was more likely than not the proximate cause of Dakota's injuries, he never worked with Family Advocacy and was not an expert on Family Advocacy's policies and procedures. Without any competent testimony about how Family Advocacy would have responded to a situation similar to Dakota's, the district court correctly held that there was only "wishful speculation" as to whether Dakota's injuries would have been prevented had Dr. Garri contacted Family Advocacy.

*Id.* at 890. Therefore, even though Dr. Garri breached the standard of care, and an expert testified regarding proximate cause, that expert could not say what Family Advocacy would or would not have done had Dr. Garri made the report. *Id.* The indication in *Chapa* is, thus, that summary judgment for defendants would have been reversed had plaintiffs provided any expert evidence of what Family Advocacy would have done had Dr. Garri reported the October 2001 incident.

Here, Dr. Cooper testified as to what DSS would have done had a report been made in April 2003. Dr. Cooper is qualified to testify about the actions of DSS due to her long-standing relationship with DSS and expertise about their policies. Other physicians testified regarding the standard of care and proximate cause, but their testimony only substantiates plaintiffs' claims to the point where DSS is actually contacted. Nevertheless, Dr. Cooper's testimony about what DSS would have done, though contradicted by Zimmerman, forecasts sufficient evidence at the summary judgment stage and creates an issue of material fact for jury consideration.

## V. Conclusion

In sum, viewing the evidence in the light most favorable to plaintiffs, there are genuine issues of material fact in dispute such that summary judgment was improperly granted for defendants. Thus, we

reverse the grant of summary judgment by the trial court and remand for further proceedings.

Reverse and Remand.

Judges STEELMAN and STEPHENS concur.