WEAVER v. SHEPPA

[186 N.C. App. 412 (2007)]

## IV.

━━━━━━━━━

KENNETH WAYNE WEAVER, AND ANN WEAVER, PLAINTIFFS v. CHARLES MICHAEL SHEPPA, M.D., LESLIE PATRICIA MARSHALL, M.D., AND RALEIGH EMERGENCY MEDICINE ASSOCIATES, INC., DEFENDANTS

No. COA07-52

(Filed 16 October 2007)

**Medical Malpractice— proximate cause—expert testimony— specialities of witnesses**

In a medical malpractice action, expert testimony on causation (rather than the standard of care) is competent as long as it is helpful to the jury and is based on information reasonably relied upon. The trial court here erred by granting a judgment NOV for defendants in an action arising from a back injury where defendants contended that plaintiffs' evidence of proximate causation did not come from appropriate experts.

Appeal by plaintiff from judgment entered 24 July 2006 by Judge A. Leon Stanback, Jr. in Wake County Superior Court. Heard in the Court of Appeals 29 August 2007.

*Knott, Clark & Berger, L.L.P., by Joe Thomas Knott, III, Michael W. Clark and Kenneth R. Murphy, III, for plaintiffs-appellants.*

*Young Moore & Henderson, P.A., by William P. Daniell; and Ellis & Winters, LLP, by Leslie C. O'Toole, for defendants-appellees.*

SMITH, Judge.

Kenneth and Ann Weaver (hereinafter Mr. Weaver and Mrs. Weaver respectively and collectively plaintiffs) appeal entry of judgment notwithstanding the verdict (herein JNOV) pursuant to N.C. Gen. Stat. § 1A-1, Rule 50(b) in favor of defendants. We reverse.

The pertinent facts may be summarized as follows: At approximately 5:00 a.m. on 29 September 2000, Mr. Weaver was unable to stand after sitting down in the bathroom of his home. The symptoms were worse on the left side of his body than the right, and he "felt numb all over." Upon Mr. Weaver's arrival by ambulance at Rex Hospital's Emergency Department (Emergency Department), he informed nursing personnel of neck pain and symptoms in his back and arms.

Soon thereafter, defendant, Dr. Charles Sheppa, examined Mr. Weaver. Defendant Dr. Sheppa informed plaintiff's wife Mrs. Weaver that he had not suffered a heart attack, but surmised that he had some kind of a problem with a disk in his neck. Dr. Sheppa then informed Mrs. Weaver that a MRI could be performed on Mr. Weaver's neck, which would enable diagnosis of such problem as might exist with a disk. However, Dr. Sheppa did not order a MRI of Mr. Weaver's neck. Instead, Dr. Sheppa ordered lab work and radiographic studies including a cervical spine film, prescribed pain medication and fitted Mr. Weaver with a soft cervical collar. After Dr. Sheppa discharged Mr. Weaver from the Emergency Department, he still had difficulty walking and continued to experience numbness in both arms and legs.

The following morning of 30 September 2000, Mr. Weaver informed Mrs. Weaver that he was getting weaker and was unable to walk unassisted. Consequently, Mrs. Weaver took Mr. Weaver back to the Rex Hospital Emergency Department, where he came under the care of defendant Dr. Leslie Marshall (Dr. Marshall). Mr. Weaver reported his continuing pain and numbness to Dr. Marshall. Upon returning from Radiology after a CT scan, Mr. Weaver continued to experience complete numbness of his entire left side and progressive

numbness with tingling and burning of his entire right side. After completing a physical examination, Dr. Marshall told Mrs. Weaver that Mr. Weaver was being discharged and he needed to follow up with his regular physician on Monday. However, while being assisted to the bathroom in a wheelchair, Mr. Weaver fell out of the wheelchair and proceeded to urinate on himself.

At this juncture, Mr. Weaver was admitted to Rex Hospital but did not receive a MRI until the following day, 1 October 2000. The MRI revealed a large central herniated disk accompanied by significant compression of Mr. Weaver's cervical spinal cord. Findings of the MRI were discussed with the on-call neurologists, Dr. Perkins. Dr. Michael Bowman (a neurologist) and Dr. Robert Allen (a neurosurgeon) subsequently informed Mrs. Weaver that emergency surgery had to be performed immediately.

Dr. Allen performed an anterior cervical discectomy and decompression of Mr. Weaver's spinal cord. Mr. Weaver required hospitalization and rehabilitation for approximately two months. Mr. Weaver regained some use of his arms and legs; however, he needed to re-learn certain everyday functions such as dressing himself, brushing his teeth, and feeding himself using a special spoon. Mr. Weaver also required a standing frame and, eventually, pool therapy in order to learn how to walk again. Over time, Mr. Weaver achieved limited mobility through use of a walker, three-pronged walker, cane and scooter.

On 2 July 2003, plaintiffs' (Mr. and Mrs. Weaver) filed the instant action, alleging *inter alia*, negligence. The action was heard by a jury on 3 April 2006, before Judge A. Leon Stanback, Jr. At trial, plaintiffs offered a litany of expert testimony from, among others, neurologists and emergency room physicians. Defendants moved for directed verdict at the close of plaintiffs' evidence and again at the close of all evidence in accordance with N.C. Gen. Stat. § 1A-1, Rule 50 (2005). The trial court denied both motions. On 18 April 2006, the trial court declared a mistrial as the jury was unable to reach a unanimous verdict on the issues submitted to them. Defendants then moved for JNOV pursuant to N.C. Gen. Stat. § 1A-1, Rule 50(b), which provides in pertinent part:

> Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; <u>or if</u>

> a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. In either case the motion shall be granted if it appears that the motion for directed verdict could properly have been granted. (emphasis added).

On 20 July 2006, the trial court granted defendants motion for JNOV. Plaintiffs filed timely notice of appeal.

In plaintiffs' sole argument on appeal, they contend the trial court erred by granting JNOV in favor of defendants because plaintiffs presented more than a scintilla of competent evidence at trial which tended to satisfy the element of proximate cause. This argument has merit.

A ruling on a motion for JNOV is a question of law for which we provide *de novo* review. *Bahl v. Talford*, 138 N.C. App. 119, 122, 530 S.E.2d 347, 350 (2000). When considering a motion for JNOV,

> all the evidence must be considered in the light most favorable to the nonmoving party. The nonmovant is given the benefit of every reasonable inference . . . from the evidence and all contradictions are resolved in the nonmovant's favor. If there is more than a scintilla of evidence supporting each element of the nonmovant's case, the motion for . . . judgment notwithstanding the verdict should be denied.

*Ace Chemical Corp. v. DSI Transports, Inc.*, 115 N.C. App. 237, 242, 446 S.E.2d 100, 103 (1994) (citations omitted).

Evidence of medical malpractice sufficient to withstand a motion for JNOV must establish each of the following essential elements: " '(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff.' " *Purvis v. Moses H. Cone Memorial Hosp. Service Corp.*, 175 N.C. App. 474, 477, 624 S.E.2d 380, 383 (2006) (quoting *Weatherford v. Glassman*, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998)). Accordingly, plaintiff must "demonstrate by the testimony of a qualified expert that the treatment administered by defendant was in negligent violation of the accepted standard of medical care in the community and that defendant's treatment proximately caused the injury." *Ballenger v. Crowell*, 38 N.C. App. 50, 54, 247 S.E.2d 287, 291 (1978). "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced

the plaintiff's injuries, and without which the injuries would not have occurred[.]" *Hairston v. Alexander Tank & Equip. Co.*, 310 N.C. 227, 233, 311 S.E.2d 559, 565 (1984). Specifically, "[e]xpert medical witnesses are called to testify on issues of causation in disease or illness for the purpose of giving their expert opinions as to the reasonable scientific certainty of a causal relation or the lack thereof." *Ballenger v. Burris Industries, Inc.*, 66 N.C. App. 556, 567, 311 S.E.2d 881, 887 (1984); *see also Tice v. Hall*, 63 N.C. App. 27, 28, 303 S.E.2d 832, 833 (1983) ("expert testimony is required to establish . . . that such negligent violation [of the requisite standard of care] was the proximate cause of the injury complained of."). Because causation is, in essence, a factual inference to be garnered from attendant facts and circumstances, it is a question generally best answered by a jury. *Leatherwood v. Ehlinger*, 151 N.C. App. 15, 24, 564 S.E.2d 883, 889 (2002). However, expert testimony based merely on speculation and conjecture "is not sufficiently reliable to qualify as competent evidence on issues of medical causation." *Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000).

In the case *sub judice*, we initially observe that defendants concede that "plaintiffs did offer evidence that the failure [of Drs. Sheppa and Marshall] to order an MRI was a deviation from the applicable standard of care[.]" Regarding causation, defendants also concede that plaintiffs "offered evidence that earlier surgery would likely have improved the outcome for Mr. Weaver." However, defendants contend pursuant to N.C. Gen. Stat. § 8C-1, Rule 702(b) (2005) that because plaintiffs' evidence regarding proximate causation did not come from a neurosurgeon, but rather from experts qualified in the specialized fields of emergency medicine and neurology, such evidence was not competent for purposes of plaintiffs' meeting their burden of production in order to withstand JNOV. Defendants, though, fail to cite any legal authority for this proposition of law and we find none.[1] Nevertheless, we observe that it is indeed "undisputed that a person is not permitted to offer expert testimony on the appropriate <u>standard of care</u> unless he qualifies under the provisions of Rule 702(b)(2) of the Rules of Evidence. *Andrews v. Carr*, 135 N.C. App. 463, 469, 521 S.E.2d 269, 273 (1999) (emphasis added). However, when the challenged expert testimony relates to <u>causation</u> such admitted testi-

---

1. The specific issue regarding whether the challenged expert witnesses were properly qualified under N.C. Gen. Stat. § 8C-1, Rule 702 was not assigned as error in the record on appeal, and not properly before this Court for appellate review. *See* N.C.R. App. P. Rule 10(a) ([T]he scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal[.]).

mony is competent "as long as the testimony is helpful to the jury and based sufficiently on information reasonably relied upon under Rule 703[.]" *Johnson v. Piggly Wiggly of Pinetops, Inc.*, 156 N.C. App. 42, 49, 575 S.E.2d 797, 802 (2003).

After a careful review of the record on appeal, we conclude that plaintiffs presented more than a scintilla of evidence supporting the proximate causation element of their medical negligence action. For example, Dr. Bruce Dobkin, an expert qualified in neurology, testified without objection on direct examination:

Q: Now going back to Mr. Weaver on September 29th, 2000, do you have an opinion, satisfactory to yourself and to a reasonable degree of medical certainty, as to whether or not surgical intervention on that day, the 29th, would have improved Mr. Weaver's ultimate outcome?

A: Yes

Q: And what is that opinion?

A: ... [W]ith a high degree of certainty, [plaintiff] would have had virtually no neurological impairments, no trouble with coordination, if he had been operated on [] the 29th.

In addition, Dr. Jackson Allison, an expert qualified in the field of emergency medicine testified, also without objection as follows:

Q: Doctor, would you please explain, in as much detail as you care to explain, why you feel so strongly that an MRI should have been ordered during Dr. Sheppa's watch on the 29th?

A: I'd be glad to, because the MRI was the only thing that was going to seal the diagnosis. . . . . He had some symptomatology, and from my experience, that the sooner that you intervene with somebody who has got some[thing] pushing against the cord, the sooner you intervene, the better the outcome is going to be for the patient. . . . MRI then a neurosurgical consultant, admit the patient, go to surgery immediately. . . . That's the answer.

Finally, Dr. Gregory Henry, also an expert qualified in emergency medicine, testified, without objection to the following question on direct examination:

Q: Did that decision [to not perform an MRI on plaintiff on 29 September] cause any damage to Mr. Kenneth Weaver?

A: I believe that had this diagnose—been diagnosed earlier, he would more than likely have had a better neurologic outcome.

Accordingly, as plaintiffs offered competent evidence of proximate causation sufficient to withstand JNOV, the trial court erred by granting the same in favor of defendants.

Reversed.

Judges McGEE and STEPHENS concur.