# COURT OF APPEALS

OF

## North Carolina

AT

### Raleigh

DUNCAN C. DAY and ASHLEY-BROOK DAY, as Co-Administrators of the Estate of DUNCAN C. DAY, JR., deceased, Plaintiffs v. THOMAS ALAN BRANT, M.D., EDWARD WILLIAM HALES, P.A., MID-ATLANTIC EMERGENCY MEDICAL ASSOCIATES, P.A. and MOORESVILLE HOSPITAL MANAGEMENT ASSOCIATES, INC. d/b/a LAKE NORMAN REGIONAL MEDICAL CENTER, Defendants

No. COA09-573-2

(Filed 17 January 2012)

## 1. Medical Malpractice—expert testimony—medical license—applicable standard of care in community

The trial court erred in a medical malpractice case by directing verdict in favor of defendants based on its conclusion that plaintiffs did not properly establish that a doctor was qualified to provide expert testimony on the applicable standard of care. A jury could reasonably infer from the testimony that the doctor did in fact have a medical license and that he was familiar with defendants and the standard of care in their community or similar communities.

## 2. Medical Malpractice—proximate cause—breach of standard of care

The trial court erred in a medical malpractice case by directing verdict in favor of defendants based on its conclusion that plaintiffs presented insufficient evidence that any breach of the standard of care proximately caused the patient's death. Although the doctor used the word "speculation" in portions of his testimony, he was merely acknowledging that the practice of putting a specific percentage on the patient's chance of survival was inherently

1

DAY v. BRANT

[218 N.C. App. 1 (2012)]

speculative. The testimony was sufficient to send the issue of proximate cause to the jury.

Appeal by plaintiffs from order entered 25 July 2008 by Judge Christopher M. Collier in Iredell County Superior Court. Heard in the Court of Appeals 4 November 2009. Opinion filed 20 July 2010. Petition for rehearing granted 29 September 2010. The following opinion supersedes and replaces the opinion filed 20 July 2010.

*John J. Korzen and David A. Manzi for plaintiffs-appellants.*

*Carruthers & Roth, P.A., by Richard L. Vanore, Norman F. Klick, Jr., and Robert N. Young, for Thomas Alan Brant, M.D., Edward William Hales, P.A., and Mid-Atlantic Emergency Medical Associates, P.A., defendants-appellees.*

*Jackson & McGee, LLP, by Sam McGee; and Ferguson, Stein, Chambers, Gresham, & Sumter, P.A., by Adam Stein, for North Carolina Advocates for Justice, Amicus Curiae.*

GEER, Judge.

Plaintiffs Duncan C. Day and Ashley-Brook Day have appealed from the trial court's grant of a directed verdict to defendants Thomas Alan Brant, M.D.; Edward William Hales, P.A.; and Mid-Atlantic Emergency Medical Associates, P.A. Plaintiffs' 16-year-old son, Duncan C. Day, Jr. ("Duncan"), was injured in a car accident and brought to Lake Norman Regional Medical Center ("LNRMC"). After being examined and released, he died from internal bleeding when his liver, which had sustained lacerations in the car accident, ruptured. Plaintiffs contend defendants were negligent in failing to discover the liver lacerations and failing to admit Duncan to the hospital for observation and treatment.

At trial, defendants made two arguments in support of their motion for a directed verdict: (1) that plaintiffs' standard of care expert, Dr. Paul Mele, was not qualified to testify to the applicable standard of care and (2) that plaintiffs' causation expert, Dr. James O. Wyatt, III, presented insufficient evidence of proximate causation. Based on our review of that testimony, we disagree and hold that the testimony of Dr. Mele and Dr. Wyatt was sufficient to defeat defendants' motion for a directed verdict. Accordingly, we reverse.

DAY v. BRANT

[218 N.C. App. 1 (2012)]

Facts

On 27 October 2003, Duncan was involved in a head-on collision after falling asleep while driving on U.S. 21 in Iredell County, North Carolina. When Duncan arrived at LNRMC, Dr. Brant and Mr. Hales were on duty in the emergency room. Duncan had a seatbelt abrasion from his left shoulder to his right upper abdomen and bruises on his arms and legs. He reported neck and chest pain. A physical examination, blood work, a chest x-ray, cervical spine x-rays, and a limited cervical spine CT scan were performed, and no significant problems were discovered. Neither Dr. Brant nor Mr. Hales ordered an ultrasound or CT scan of Duncan's abdomen. Duncan was given pain medication and discharged.

The next morning, 28 October 2003, Duncan was found unresponsive at home and was pronounced dead on arrival at LNRMC. Internal bleeding from a liver rupture caused his death. Plaintiffs filed suit against Dr. Brant, Mr. Hales, Mid-Atlantic Emergency Medical Associates, and LNRMC in Iredell County Superior Court on 15 November 2004, but subsequently voluntarily dismissed the claim against LNRMC.

At trial, plaintiffs called Dr. Paul Mele, a board certified emergency medicine physician with 20 years of experience, to give an expert opinion on the standard of care. After the trial court admitted Dr. Mele as an expert over defendants' objection, Dr. Mele explained that the liver and the spleen are the organs most commonly injured after blunt force trauma to the abdomen. According to Dr. Mele, simply being restrained by a seat belt can injure these organs.

Dr. Mele concluded that Dr. Brant and Mr. Hales failed to follow the standard of care in treating Duncan. He testified that given the facts known by the two men—Duncan was in a car accident, had chest pain, was bruised across his chest from his shoulder harness, was overweight, and was a teenager—Dr. Brant and Mr. Hales should have been alerted to the possibility that Duncan might have suffered an abdominal injury despite not reporting abdominal pain or suffering a broken rib. According to Dr. Mele, Dr. Brant and Mr. Hales "just really didn't give the abdomen a fair chance to be evaluated," and "[i]t was just too easily dismissed as not an abdominal injury scenario at all . . . ."

Plaintiffs tendered, without objection, their causation expert, Dr. James O. Wyatt, III, as an expert in trauma surgery. Dr. Wyatt explained that Duncan's death was due to exsanguination caused by

a Grade IV or V laceration to his liver and a Grade II injury to his spleen. According to Dr. Wyatt, a "fair amount" of blood had built up underneath the laceration to Duncan's liver, and when it subsequently broke loose, it resulted in rapid bleeding that caused Duncan to pass out and go into cardiac arrest.

Dr. Wyatt testified that none of the studies performed on Duncan when first seen at the hospital would have diagnosed this problem and that such a diagnosis is usually made using a CT scan of the abdomen and pelvis. He testified that if the diagnosis had been made, Duncan should have been admitted to the hospital, where the injury should have initially been handled non-operatively. Dr. Wyatt detailed the options if non operative management failed, including "[a]ngiography with possible embolization," "[s]urgical management with possible hepatic repair," and/or "[s]urgical management with damage control packing." In his written report, he concluded that "[s]urvival is excellent (>51%) in patients who arrive in the hospital and get proper initial and subsequent management." Dr. Wyatt believed that if Duncan had been in the hospital when his liver ruptured, "he would have survived it."

At the conclusion of plaintiffs' evidence, defendants moved for a directed verdict on the grounds that Dr. Mele was not qualified to give an expert opinion on the standard of care and that plaintiffs had not shown proximate cause. The trial court granted the motion without specifying its grounds. Plaintiffs timely appealed to this Court.

### Discussion

" 'This Court reviews a trial court's grant of a motion for directed verdict *de novo.*' " *Kerr v. Long*, 189 N.C. App. 331, 334, 657 S.E.2d 920, 922 (2008) (quoting *Herring v. Food Lion, LLC*, 175 N.C. App. 22, 26, 623 S.E.2d 281, 284 (2005), *aff'd per curiam*, 360 N.C. 472, 628 S.E.2d 761 (2006)). The Court must determine " 'whether, upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence [is] sufficient to be submitted to the jury.' " *Id.* (quoting *Brookshire v. N.C. Dep't of Transp.*, 180 N.C. App. 670, 672, 637 S.E.2d 902, 904 (2006)).

"When a defendant moves for a directed verdict in a medical malpractice case, the question raised is whether the plaintiff has offered evidence of each of the following elements of his claim for relief: (1) the standard of care, (2) breach of the standard of care, (3) proximate causation, and (4) damages." *Turner v. Duke Univ.*, 325 N.C. 152, 162,

381 S.E.2d 706, 712 (1989). In this case, the sole issues are the sufficiency of the evidence as to the standard of care and proximate causation.

I

**[1]** There is no dispute that Dr. Mele testified that defendants breached the standard of care. Defendants, however, contend that plaintiffs did not properly establish that Dr. Mele was qualified to provide expert testimony on the applicable standard of care. In medical malpractice cases, " '[b]ecause questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge, the plaintiff must establish the relevant standard of care through expert testimony.' " *Billings v. Rosenstein*, 174 N.C. App. 191, 194, 619 S.E.2d 922, 924 (2005) (quoting *Smith v. Whitmer*, 159 N.C. App. 192, 195, 582 S.E.2d 669, 671-72 (2003)).

N.C. Gen. Stat. § 90-21.12 (2009) sets out the standard of care applicable in a medical malpractice action:

> In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

An expert witness may testify regarding this standard of care " 'when that physician is familiar with the experience and training of the defendant and either (1) the physician is familiar with the standard of care in the defendant's community, or (2) the physician is familiar with the medical resources available in the defendant's community and is familiar with the standard of care in other communities having access to similar resources.' " *Purvis v. Moses H. Cone Mem'l Hosp. Serv. Corp.*, 175 N.C. App. 474, 478, 624 S.E.2d 380, 384 (2006) (quoting *Barham v. Hawk*, 165 N.C. App. 708, 712, 600 S.E.2d 1, 4 (2004), *aff'd per curiam by an equally divided court*, 360 N.C. 358, 625 S.E.2d 778 (2006)).

Defendants first argue that Dr. Mele was not qualified to testify under Rule 702(b) of the Rules of Evidence because he never testified he was a licensed physician. *See* N.C.R. Evid. 702(b) (providing that

"[i]n a medical malpractice action as defined in G.S. 90-21.11, a person shall not give expert testimony on the appropriate standard of health care as defined in G.S. 90-21.12 *unless the person is a licensed health care provider* in this State or another state and meets" specified criteria (emphasis added)).

While Dr. Mele was never specifically asked whether he had a medical license, he testified that he was an emergency medicine physician; that he was board certified in emergency medicine; that he used to have emergency room privileges at Rex Hospital in Raleigh, North Carolina; that he had stopped practicing in an emergency department less than a year earlier because of the difficulties in working on a night shift; that, at the time of the trial, he was instead practicing in occupational medicine and urgent care; and that he now had urgent care privileges at hospitals. Even though Dr. Mele, at the time of his testimony, was no longer an emergency medicine doctor, he was still practicing medicine. A jury could reasonably infer from this testimony that Dr. Mele did in fact have a medical license.

Defendants next contend that plaintiffs failed to show Dr. Mele's familiarity with defendants' community at the time of the alleged breach. If a plaintiff's standard of care expert witness "fail[s] to demonstrate that he [is] sufficiently familiar with the standard of care 'among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action,' " then the "plaintiff [is] unable to establish an essential element of his claim, namely, the applicable standard of care," and the trial court properly enters judgment on behalf of the defendant. *Smith*, 159 N.C. App. at 197, 582 S.E.2d at 673 (quoting N.C. Gen. Stat. § 90-21.12).

Dr. Mele testified at trial that he reviewed defendants' depositions to determine the standard of practice for emergency medicine at LNRMC in 2003. He confirmed that the way they practiced emergency medicine was no different than his practice and that their training and experience in emergency medicine was no different. Dr. Mele reviewed the website of the medical group employing Dr. Brant and Mr. Hales and "read through the qualifications and trainings of their doctors and PA's." He concluded that the physicians had similar academic backgrounds, training, and experience to his.

Dr. Mele also reviewed documents describing the population of the community, the number of beds in the hospital, the kinds of facilities available in the hospital, the kinds of patients seen, and the diag-

DAY v. BRANT

[218 N.C. App. 1 (2012)]

nostic services available.[1] He testified that the descriptions of the facilities, the equipment available, the number of beds, and the services performed were all similar to that of hospitals in which he has worked, including Rex Hospital.[2] Dr. Mele did internet research to obtain demographics regarding Mooresville and determined that it was similar to Wake County where Rex Hospital is located. Additionally, Dr. Mele testified that during his career, he has had an opportunity to consult with practitioners working in communities very similar to Iredell County and has determined that the standard of care in those communities is the same as in Iredell County and in the facilities in which he has worked.

This testimony was sufficient to establish Dr. Mele's familiarity with defendants and the standard of care in their community or similar communities. *See Billings*, 174 N.C. App. at 195, 619 S.E.2d at 925 (holding that doctor established sufficient familiarity with standard of care for neurologists in Wilkes County, North Carolina, when he examined demographic data on Wilkes County, he testified he was familiar with similar communities, he was licensed in North Carolina, and he had practiced in multiple communities in North Carolina); *Pitts v. Nash Day Hosp., Inc.*, 167 N.C. App. 194, 199, 605 S.E.2d 154, 157 (2004) (holding doctor qualified to testify when he reviewed demographic information regarding Rocky Mount, North Carolina, drove through Rocky Mount, drove by hospital, determined surgical resources available from report of operation, and had practiced in other small towns in North Carolina), *aff'd per curiam*, 359 N.C. 626, 614 S.E.2d 267 (2005); *Coffman v. Roberson*, 153 N.C. App. 618, 624, 571 S.E.2d 255, 259 (2002) (holding that doctor could testify regarding standard of care where doctor testified that: (1) he practiced in Charlotte, North Carolina and was licensed to practice throughout State; (2) he was familiar with standard of care of communities similar to Wilmington, North Carolina; and (3) he based his opinion on internet research he conducted about hospital's size, training program, and other information); *Leatherwood v. Ehlinger*, 151 N.C. App. 15, 22 23, 564 S.E.2d 883, 888 (2002) (reversing directed verdict when plaintiffs' expert specifically testified that he had knowledge of standard of care in Asheville, North Carolina and similar communities because of his practice in communities of size similar to Asheville

1. Although defendants contend that Dr. Mele did not specify in his trial testimony that he was reviewing 2003 information about the community and the hospital, his testimony as a whole indicates that he was looking at information from 2003.

2. Dr. Mele had in fact worked in the emergency department at LNRMC in 1992 or 1993.

and because he had attended rounds as medical student in Asheville hospital at issue).

To the extent defendants are challenging the fact that Dr. Mele acquired most of his information regarding the community after reaching his opinions and having his deposition taken, this Court has already rejected the argument that such an approach disqualifies the doctor's testimony. In *Roush v. Kennon*, 188 N.C. App. 570, 576, 656 S.E.2d 603, 607 (2008), the expert witness dentist, who was from Atlanta, Georgia, had similarly testified in a deposition that he had never been to the community at issue (Charlotte) and knew nothing about the dental community in Charlotte, but, prior to trial, had "supplement[ed] his understanding of the applicable standard of care in the Charlotte metropolitan area by reviewing, *inter alia*, the demographic data for the Charlotte metropolitan area, the Dental Rules of the North Carolina State Board of Dental Examiners, and the deposition of [the defendant] regarding the procedures, techniques, and implements which he used . . . ." Based on this supplemented knowledge, the Court concluded that the expert witness had sufficient familiarity with Charlotte to testify consistent with N.C. Gen. Stat. § 90-21.12. 188 N.C. App. at 576-77, 656 S.E.2d at 608. We can see no meaningful distinction between this case and *Roush*.

Defendants also argue that Dr. Mele "never testified as to what he specifically learned about the relevant community from reading Defendants' depositions and did not give any specific testimony regarding the physician skill and training in the community, facilities, equipment, funding or physical and financial environment of the evant medical community." Defendants have cited no authority requiring that an expert witness testify "as to what he specifically learned," and we have found none.

*Smith* establishes that an expert witness cannot simply assert that he is familiar with the applicable standard of care without also providing an explanation of the basis for his familiarity. *Smith*, 159 N.C. App. at 196, 582 S.E.2d at 672 ("Although Dr. Heiman asserted that he was familiar with the applicable standard of care, his testimony is devoid of support for this assertion."). *Smith* does not, however, require the degree of specificity urged by defendants. In *Smith*, the proposed expert admitted that the only basis for his claim of familiarity with the standard of care was verbal information received from the plaintiff's attorney regarding the size of the community and " 'what goes on there.' " *Id.* at 196-97, 582 S.E.2d at 672. The expert knew nothing about the medical community, had never visited the

community, had not spoken to health care practitioners in the community, and was " 'not acquainted with the medical community' " in the area involved. *Id.* at 197, 582 S.E.2d at 672. Further, the expert "offered no testimony regarding defendants' training, experience, or the resources available in the defendants' medical community." *Id.*, 582 S.E.2d at 673.

In this case, Dr. Mele established in his testimony that he had done research and had personal knowledge that supplied the information that the expert in *Smith* lacked. While Dr. Mele did not testify to specific numbers or actual details regarding the hospital and community, his testimony provided a basis—his research and personal knowledge—for his claim of familiarity. This case does not involve a bare statement of familiarity such as that present in *Smith*.

Finally, defendants argue that Dr. Mele incorrectly applied a national standard of care rather than the " 'same or similar community' " standard applicable in North Carolina. In *Smith*, although the plaintiff's expert testified he was familiar with the standard of care for orthopedic surgeons practicing in the relevant community, he ultimately admitted that he was basing his opinions on the fact that the standard of care for orthopedic surgeons all over the country was " 'very similar.' " *Id.* at 194, 582 S.E.2d at 671. In affirming the trial court's exclusion of the expert's testimony, this Court observed that the expert could comment only on the standard of care anywhere in the country regardless of what the medical community involved in the case might do. *Id.* at 197, 582 S.E.2d at 672. Because "there was no evidence that a national standard of care is the same standard of care practiced in defendants' community[,]" this testimony was insufficient. *Id.*, 582 S.E.2d at 673.

It is, however, established that mere mention of a national standard is not sufficient to warrant disregard of an expert's testimony if the expert has testified regarding his or her familiarity with the standard of care in the same or similar communities. In *Roush*, 188 N.C. App. at 576, 656 S.E.2d at 607-08, once this Court concluded that the plaintiff's expert was qualified to testify given the evidence of his familiarity with Charlotte and his conclusion that the standard of care there was similar to that of Atlanta, "[t]he fact that [the plaintiff's expert] previously testified that he believed in a national standard of care [did] not invalidate this conclusion." *See also Pitts*, 167 N.C. App. at 197, 605 S.E.2d at 156 ("Although Dr. Strickland testified that the standard of care for laparoscopic surgery is a national standard,

we are not of the opinion that such testimony inexorably requires that his testimony be excluded. Rather, the critical inquiry is whether the doctor's testimony, taken as a whole, meets the requirements of N.C. Gen. Stat. § 90-21.12."); *Cox v. Steffes*, 161 N.C. App. 237, 244, 246, 587 S.E.2d 908, 913, 914 (2003) (holding that although witness testified that standard of care at issue "was in fact the same across the nation," testimony was sufficient to support jury's verdict of negligence, despite reference to national standard of care, because expert had testified specifically that he knew standard of care practiced in defendant's community).

Defense counsel, in this case, asked Dr. Mele whether he was testifying that he was applying a national standard of care, to which Dr. Mele responded:

> A. I testified that I understood the national standard of care to mean that any hospital that's a Level Two trauma center, perhaps the way we are, would have the same kind of care and the same kind of expertise no matter what city or state it was located in, if it was a Level Two trauma center with particular surgeons and diagnostic capabilities available.

Defense counsel then asked: "And the standard of care that you're applying is the standard of care that you believe would be the same in any city in America; correct?" Dr. Mele replied:

> A. Standard of care applying is a board certified ER doctor who has CAT scan available and has a surgeon available, who has nurses and paramedics available. . . . Those are a more generic definition of what's available to practice medicine in that ER.

> . . . .

> A. The word national doesn't have the same meaning to me as perhaps you. And if I missed the legal point with that, I apologize. But the standard I'm applying is the training that was available to the physician, the training that was available to the P.A. and the resources that are available for him to do that. It doesn't, in my mind, change his skill or his abilities, what building he's practicing or what the name of the city is if he has those facilities available. So maybe I misspoke on that, but that's my concept.

Q. And your concept is that the standard of care is the same in any city in the [sic] America, isn't that right?

A. The concept is the standard of care is the same if those other conditions are met.

It is questionable whether this testimony could even be viewed as embracing a national standard of care since Dr. Mele repeatedly rejected defense counsel's attempt to extend Dr. Mele's opinion to all cities and limited his opinion, as our courts require, to those cities having the same facilities, resources, and training available. In any event, Dr. Mele's testimony as a whole met the requirements of N.C. Gen. Stat. § 90-21.12, and he specifically testified that the standard of care he was applying was the standard of care for defendants' community, just like the experts in *Roush*, *Pitts*, and *Cox*.

We, therefore, hold that Dr. Mele was qualified to testify as to the applicable standard of care. Since defendants have not disputed that Dr. Mele further testified that defendants breached that standard of care, plaintiffs presented sufficient evidence to go to the jury on the question of the breach of the standard of care.

II

[2] Defendants argued alternatively that plaintiffs presented insufficient evidence that any breach of the standard of care proximately caused Duncan's death. As this Court has explained, "[o]ur courts rely on medical experts to show medical causation because 'the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen[.]' " *Azar v. Presbyterian Hosp.*, 191 N.C. App. 367, 371, 663 S.E.2d 450, 453 (2008) (quoting *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980)), *cert. denied*, 363 N.C. 372, 678 S.E.2d 232 (2009).

The expert testimony must establish that the connection between the medical negligence and the injury is " 'probable, not merely a remote possibility.' " *Id.* (quoting *White v. Hunsinger*, 88 N.C. App. 382, 387, 363 S.E.2d 203, 206 (1988)). If, however, "this testimony is based merely upon speculation and conjecture, . . . it is no different than a layman's opinion, and as such, is not sufficiently reliable to be considered competent evidence on issues of medical causation." *Id.* (citing *Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000)).

Defendants argue that Dr. Wyatt's testimony was insufficient evidence of proximate cause because Dr. Wyatt's testimony as to Duncan's chances of survival, had he been admitted and observed at the hospital, amounted to mere speculation.[3] Defendants contend that, as to this issue, the Court should apply the abuse of discretion standard of review set out in *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 458, 597 S.E.2d 674, 686 (2004). We disagree.

*Howerton* addresses the test applicable in determining the *admissibility* of expert testimony. *Id.* In *Howerton*, our Supreme Court set out a "three-step inquiry for evaluating the admissibility of expert testimony: (1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? (2) Is the witness testifying at trial qualified as an expert in that area of testimony? (3) Is the expert's testimony relevant?" *Id.* (internal citations omitted).

In this case, there was no dispute at trial regarding the admissibility of Dr. Wyatt's expert testimony. He was admitted as an expert witness without any objection. As for the first prong of the test, defendants expressed no concern regarding the reliability of Dr. Wyatt's "method of proof." *See id.* at 459, 460, 597 S.E.2d at 687 (holding that, in determining reliability, trial court should first look at whether precedent justifies recognition or rejection of "scientific theory or technique" advanced by expert; in absence of precedent, trial court must look at indices of reliability, including expert's use of established techniques, expert's professional background in field, use of visual aids before jury, and independent research conducted by expert"). As for the other two prongs, defendants neither challenge Dr. Wyatt's qualifications to testify nor argue that his testimony was irrelevant. *Howerton* is simply inapplicable.

Instead of challenging the admissibility of Dr. Wyatt's testimony, defendants, at trial and on appeal, have challenged the sufficiency of Dr. Wyatt's testimony to establish causation. Our Supreme Court in *Holley v. ACTS, Inc.*, 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003), warned that "the standards for admissibility of expert opinion testimony have been confused with the standards for sufficiency of such testimony." Expert testimony as to causation "is admissible if helpful to the jury," although it may be "insufficient to prove causation, particularly 'when there is additional evidence or testimony showing the

---

3. Defendants also argue that Dr. Wyatt's testimony as to when Duncan's liver began to bleed and the process that ultimately caused his death was speculation. This testimony is immaterial to the issues raised on appeal, and we do not address it.

expert's opinion to be a guess or mere speculation.' " *Id.* at 233, 581 S.E.2d at 753 (quoting *Young*, 353 N.C. at 233, 538 S.E.2d at 916). Defendants' argument on appeal perpetuates this confusion by failing to distinguish between the standard of review for admissibility and the standard of review for the sufficiency of the evidence.

Our Supreme Court, in *Howerton*, cautioned against the merging of the two issues. After rejecting the federal *Daubert* standard for evaluating the admissibility of expert testimony, the Court emphasized its "concern[] that trial courts asserting sweeping pre-trial 'gatekeeping' authority under *Daubert* [regarding the admissibility of expert testimony] may unnecessarily encroach upon the constitutionally-mandated function of the jury to decide issues of fact and to assess the weight of the evidence." *Howerton*, 358 N.C. at 468, 597 S.E.2d at 692.

More recently, the Supreme Court underscored, in the medical malpractice context, *Howerton's* desire to ensure that preliminary questions of admissibility not intrude upon the right to trial by jury:

> We emphasized [in *Howerton*], on the other hand, that the trial court's preliminary assessment should not "go so far as to require the expert's testimony to be proven conclusively reliable or indisputably valid before it can be admitted into evidence." [*Howerton*, 358 N.C.] at 460, 597 S.E.2d at 687. Evidence may be "shaky but admissible," and it is the role of the jury to make any final determination regarding the weight to be afforded to the evidence. *Id.* at 460-61, 597 S.E.2d at 687-88 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 125 L. Ed. 2d 469, 484, 133 S. Ct. 2786, 2798 (1993)).

*Crocker v. Roethling*, 363 N.C. 140, 149-50, 675 S.E.2d 625, 632 (2009) (Martin, J., concurring).[4] The Court further pointed to "the emphasis *Howerton* places on the jury's role in evaluating expert testimony" and concluded that procedures must be adopted with an eye towards "protecting the jury from unreliable expert testimony yet preserving the jury's role in weighing the credibility of expert testimony when appropriate." *Id.* at 153, 675 S.E.2d at 634-35. Even the dissent in *Crocker* recognized that *Howerton* called on the trial court, when "determining whether an expert's testimony is sufficiently reliable for admission," to make " 'a preliminary, foundational inquiry into the basic methodological adequacy of [the] expert testimony.' " *Id.* at 157, 675 S.E.2d at 637 (quoting *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687).

---

4. Justice Martin's opinion concurring in the plurality opinion by Justice Hudson constitutes the controlling opinion. *Id.* at 154 n.1, 675 S.E.2d at 635 n.1 (Newby, J., dissenting).

In this appeal, no issue exists regarding any preliminary foundational inquiry into the basic methodological adequacy of Dr. Wyatt's testimony or his qualifications to testify. *Howerton* is immaterial, as is its standard of review. Instead, the proper standard of review is the one applicable to decisions at trial regarding the sufficiency of the evidence to take plaintiff's case to the jury—the directed verdict standard.

This conclusion is consistent with this Court's decision in *Weaver v. Sheppa*, 186 N.C. App. 412, 651 S.E.2d 395 (2007), *aff'd per curiam by an equally divided court*, 362 N.C. 341, 661 S.E.2d 733 (2008), a medical malpractice appeal in which the Court reversed the trial court's grant of judgment notwithstanding the verdict ("JNOV:"). After noting that "[b]ecause causation is, in essence, a factual inference to be garnered from attendant facts and circumstances, it is a question generally best answered by a jury," the Court acknowledged—as defendants argue here—that "expert testimony based merely on speculation and conjecture 'is not sufficiently reliable to qualify as competent evidence on issues of medical causation.' " *Id.* at 416, 651 S.E.2d at 398 (quoting *Young*, 353 N.C. at 230, 538 S.E.2d at 915).

However, the Court further stressed that "when the challenged expert testimony relates to *causation* such admitted testimony is competent 'as long as the testimony is helpful to the jury and based sufficiently on information reasonably relied upon under Rule 703[.]' " *Id.* at 416-17, 651 S.E.2d at 399 (quoting *Johnson v. Piggly Wiggly of Pinetops, Inc.*, 156 N.C. App. 42, 49, 575 S.E.2d 797, 802 (2003)). The Court then proceeded to review the sufficiency of the expert testimony of causation under the traditional standard of review applicable to decisions granting JNOV. *Id.* at 417, 651 S.E.2d at 399 ("After a careful review of the record on appeal, we conclude that plaintiffs presented more than a scintilla of evidence supporting the proximate causation element of their medical negligence action."). Consequently, in this case, we apply the standard of review applicable to directed verdicts and not the *Howerton* abuse of discretion standard urged by defendants.

Turning to the merits, Dr. Wyatt testified that had a CT scan been performed on Duncan's abdomen, the liver lacerations would have been discovered. He also testified that he believed Duncan died from the bleeding caused by the liver lacerations and subsequent rupture.

Dr. Wyatt was then asked, "And you have an opinion satisfactory to yourself and to a reasonable degree of medical certainty that had [Duncan's] liver laceration been diagnosed and treated that he would

have had a better than 51 percent chance of survival?" Dr. Wyatt responded, "Yes." He testified: "I believe he would have survived it." This was in conformity with Dr. Wyatt's conclusion in his written report, admitted into evidence, that "[s]urvival is excellent (>51%) in patients who arrive in the hospital and get proper initial and subsequent management."

On cross-examination, Dr. Wyatt was asked, "And you cannot say to a reasonable degree of medical certainty that had he been admitted for observation that the outcome would have been any different, because it's speculation, correct?" He replied: "It is speculation, but I do think he would have had a better chance of surviving." He admitted that he could not "say for certainty" that Duncan would have survived. Dr. Wyatt was then asked:

> Q. And where you talked about in response to the questions of [plaintiffs' counsel], in your report where it says "survival is excellent," that's . . . where you say "greater than 51 percent," . . . you're talking generally, patients generally have survival chances above 51 percent, correct?

He responded:

> A. Well, I was talking specifically about this injury. If—if he had been observed in the proper unit when he started to bleed or showed signs of instability, then I think he had a greater than 50 percent chance of surviving.

When defense counsel pressed him to agree that "he would have had a better chance, but no one can say—it would be speculation to say he would have had a 51 percent or a 49 percent chance, correct?", Dr. Wyatt replied: "That's all speculation."

Finally, Dr. Wyatt was asked:

> Q. And that with regard to this particular case and Duncan Day's particular circumstances, you cannot say to any certainty that he would have, in fact, survived, correct?
>
> [Plaintiffs' Counsel]: Objection.
>
> A. I'm not quite sure if I understand the question.
>
> Q. Okay. Meaning that with regard to Duncan Day's situation, as you just testified to, all you can say is that he would have had a better chance of survival. You can't say what percentage it would have been. Correct?

DAY v. BRANT

[218 N.C. App. 1 (2012)]

A. I can say; but, I mean, that's—it's all just specu—I mean, it's—it's guessing. I don't—

Q. Okay.

A. He certainly would have had a better chance of survival.

Q. Okay. But in terms of what percentage, then it would all be speculation, correct?

A. Right.

Q. And all you can say is he just would have had a better chance, correct?

A. Yes.

On re-direct, Dr. Wyatt was asked:

Q. Based on the patients that you have treated with Type IV or Type V liver lacerations, is it still your opinion of the over—based on your overall experience that those people given proper management have a better than 51 percent [sic] of survival?

A. What I can—

[Defendants' Counsel]: Objection.

A. What I can say from my experience is that those who have been managed in the hospital with Grade IV liver lacerations and some Grade V's, most of them have survived.

Q. Would it be more than 51 percent?

A. Yes.

We believe this case is controlled by *Felts v. Liberty Emergency Serv., P.A.*, 97 N.C. App. 381, 388 S.E.2d 619 (1990). In *Felts*, the plaintiffs' expert witness testified that it was " 'possible' " that the plaintiff's heart attack could have been prevented if the plaintiff had been admitted to the hospital's Coronary Care Unit. *Id.* at 388, 388 S.E.2d at 623. Although acknowledging that this testimony that the heart attack could have possibly been prevented, standing alone, would not be sufficient, the Court pointed out that the expert had also given "a detailed explanation of how admission to a hospital . . . could have prevented plaintiff's heart attack." *Id.* at 389, 388 S.E.2d at 623.

The Court held that the testimony as a whole "raise[d] more than a 'mere possibility or conjecture' and [wa]s sufficient to withstand a directed verdict." *Id.* (quoting *Bruegge v. Mastertemp, Inc.*, 83 N.C. App. 508, 510, 350 S.E.2d 918, 919 (1986)). The Court explained:

> We find that plaintiffs' evidence at trial establishes more than a minimal "showing that different treatment would have improved [his] chances of recovery." Plaintiffs' evidence before the trial court tended to show that defendants' failure to hospitalize and failure to more thoroughly diagnose plaintiff's condition contributed to his myocardial infarction and its severity. We hold that this is sufficient to overcome a directed verdict motion on the issue of proximate cause.

*Id.* at 390, 388 S.E.2d at 624.

Here, Dr. Wyatt specifically testified that "if [Duncan] had been observed in the proper unit when he started to bleed or showed signs of instability, then I think he had a greater than 50 percent chance of surviving." On top of specifically testifying that had he been admitted and observed, Duncan would have had a greater than 50% chance of survival, Dr. Wyatt's report explicitly set out how, if the laceration had been discovered, a rupture and internal bleeding could have been prevented or stopped. Under *Felts*, this was sufficient evidence of proximate cause.

Defendants, however, argue that Dr. Wyatt's proximate cause testimony amounted to speculation. In *Young*, the Supreme Court recognized that "when . . . expert opinion testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman's opinion. As such, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation." 353 N.C. at 230, 538 S.E.2d at 915. In that case, the Court held that the plaintiff's expert's opinion as to what caused the plaintiff's fibromyalgia "was based entirely upon conjecture and speculation." *Id.* at 231, 538 S.E.2d at 915. The expert had testified that there were several potential causes of the plaintiff's fibromyalgia other than her work-related back injury, but that he had not performed any testing to determine what was, in fact, the cause of her symptoms. *Id.* That testimony was not sufficient evidence of proximate causation. *Id.* at 233, 538 S.E.2d at 917.

Similarly, in *Azar*, 191 N.C. App. at 371, 663 S.E.2d at 453, this Court held there was not sufficient evidence of causation when the plaintiff's expert testified that the plaintiff's bedsores were " 'at least

one cause of infection' " and that she died " 'as a result of all of [her] complications.' " The Court held that the expert's testimony was mere speculation because he could not identify which complication was the ultimate cause of her death. *Id.* at 372, 663 S.E.2d at 453. *See also Campbell v. Duke Univ. Health Sys., Inc.*, 203 N.C. App. 37, 44-45, 691 S.E.2d 31, 37 (holding expert testimony constituted speculation where expert unable to point to any specific action by defendants during plaintiff's surgery that would have caused injury), *disc. review denied*, 364 N.C. 434, 702 S.E.2d 220 (2010).

Here, there is no dispute that Duncan died because of the bleeding due to lacerations to his liver sustained in the car accident. This case is, therefore, unlike *Young*, in which the question was what caused the injurious condition (fibromyalgia), and unlike *Azar*, in which the issue was which condition was the immediate cause of death. It is also unlike *Campbell* in that Dr. Wyatt, in discussing the cause of Duncan's death, specifically pointed to defendants' failure to uncover the lacerations through a CT scan and to hospitalize Duncan for observation and treatment. Dr. Wyatt also gave a detailed explanation of how the failure to perform a CT abdomen scan and admit Duncan to the hospital caused Duncan's death, explaining the list of steps that could have been taken to treat the injury had the scan been performed and the lacerations been discovered while Duncan was in the hospital.

Although defendants also have cited *Gaines v. Cumberland Cnty. Hosp. Sys., Inc.*, 195 N.C. App. 442, 446, 672 S.E.2d 713, 716 (2009), this Court granted rehearing in that case, 203 N.C. App. 213, 222-23, 692 S.E.2d 119, 124-25, *disc. review denied*, 364 N.C. 324, 700 S.E.2d 750 (2010). Initially, this Court held that expert testimony was speculative and insufficient to show proximate cause when the expert testified that if the health care provider defendants had pursued an investigation of potential child abuse of the plaintiff, they would have reported the situation to the Department of Social Services ("DSS"). DSS would have then investigated and substantiated the report and removed the plaintiff from the home, preventing further injury. The Court reasoned that while the expert "did testify regarding what she believed was more likely than not the proximate cause of [the plaintiff's] injuries, her testimony was based on speculation and was not grounded in fact." *Gaines*, 195 N.C. App. at 446, 672 S.E.2d at 716.

On rehearing, however, this Court held that this testimony was sufficient evidence of proximate cause to survive summary judgment, explaining that the expert, who was familiar with DSS policies and

procedures, had specifically listed how and why the plaintiff would have been removed from the home, and how the defendants' negligence in not investigating more likely than not caused the plaintiff's injuries. *Gaines*, 203 N.C. App. at 222-23, 692 S.E.2d at 124-25. The Court held that any competing testimony was a question for the jury. *Id.* at 223, 692 S.E.2d at 125.

Similarly, in this case, Dr. Wyatt had experience treating patients with comparable liver lacerations, specifically listed what would have been done had the lacerations been diagnosed and Duncan hospitalized, and testified that "most" patients with Duncan's level of lacerations survive if hospitalized and properly managed. Under *Gaines*, this testimony was sufficient to take the case to the jury.

Defendants nonetheless contend that Dr. Wyatt admitted that his testimony was speculation. Although Dr. Wyatt used the word "speculation" in portions of his testimony, our review of the entirety of his testimony indicates that Dr. Wyatt was not labeling as speculation his opinion that if Duncan's liver laceration had been diagnosed and treated, he would have had greater than 51% chance of survival. Rather, we read his testimony as acknowledging that the practice of putting a specific percentage on Duncan's chance of survival is inherently speculative. Dr. Wyatt, however, ultimately testified that "most" patients with Duncan's injury who are treated in accordance with the standard of care will survive and that he believes Duncan "would have survived." This opinion is sufficient to establish a probability of survival regardless of the precise numerical percentage used. *See also Turner*, 325 N.C. at 160, 381 S.E.2d at 711 (reversing directed verdict entered based on lack of evidence of proximate cause when expert witness expressed opinion that defendant "should have carefully examined Mrs. Turner's abdomen [and] [h]ad he done so, a colostomy could subsequently have been performed which could have saved Mrs. Turner's life"; stating that "[s]uch evidence is the essence of proximate cause").

We also note that we cannot, as defendants urge, pull out portions of Dr. Wyatt's testimony that might support a directed verdict and disregard portions that would support sending the case to the jury. A defendant cannot justify a directed verdict by pointing to inconsistencies and contradictions in a plaintiff's evidence because "on a motion for directed verdict conflicts in the evidence unfavorable to the plaintiff must be disregarded." *Polk v. Biles*, 92 N.C. App. 86, 88, 373 S.E.2d 570, 571 (1988). Conflicts in the evidence and contradictions within a particular witness' testimony are "for the jury to

resolve." *Shields v. Nationwide Mut. Fire Ins. Co.*, 61 N.C. App. 365, 374, 301 S.E.2d 439, 445 (1983). *See also Alexander v. Wal-Mart Stores, Inc.*, 166 N.C. App. 563, 573, 603 S.E.2d 552, 558 (2004) (Hudson, J., dissenting) ("[I]t is [not] the role of this Court to comb through the testimony and view it in the light most favorable to the defendant, when the Supreme Court has clearly instructed us to do the opposite. Although by doing so, it is possible to find a few excerpts that might be speculative, this Court's role is not to engage in such a weighing of the evidence."), *rev'd per curiam for reasons in dissenting opinion*, 359 N.C. 403, 610 S.E.2d 374 (2005).

This aspect of the directed verdict standard is consistent with the Supreme Court's holding in *Howerton* that "once the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility." 358 N.C. at 461, 597 S.E.2d at 688. *See also Turner*, 325 N.C. at 161-62, 381 S.E.2d at 712 (refusing to uphold directed verdict in medical malpractice case based on expert's answers to cross-examination questions because doing so would require construing evidence in light most favorable to movants, which "the law does not permit"); *Workman v. Rutherford Elec. Membership Corp.*, 170 N.C. App. 481, 494, 613 S.E.2d 243, 252 (2005) (in workers' compensation case, holding that even though causation expert did not testify without equivocation and gave testimony conflicting to some extent with his medical notes, "[c]redibility issues caused by any variance in [expert's] treatment notes and his later testimony was for the Commission to decide").

Finally, defendants argue that Dr. Wyatt's testimony is insufficient because he merely testified that if the liver laceration had been discovered and Duncan had been in the hospital when his liver ruptured, he had a "better" chance of survival. In this respect, defendants contend this case is similar to *Lord v. Beerman*, 191 N.C. App. 290, 664 S.E.2d 331 (2008), and *White v. Hunsinger*, 88 N.C. App. 382, 363 S.E.2d 203 (1988).[5]

In *Lord*, 191 N.C. App. at 297, 664 S.E.2d at 336, the plaintiff's first expert testified that although earlier receipt of steroid therapy might

---

5. Defendants also cite *Norman v. Branner*, 171 N.C. App. 515, 615 S.E.2d 738, 2005 WL 1669128, 2005 N.C. App. LEXIS 1324 (2005) (unpublished), but as that case is unpublished and not controlling authority, we do not discuss it.

hasten a patient's recovery with respect to most eye diseases, he could not say whether earlier treatment would have increased the plaintiff's prognosis due to the rarity of his particular eye disease and the lack of research. The plaintiff's second expert similarly testified that while earlier steroid treatment " 'perhaps' " could have led to a fuller recovery and that the plaintiff's eyesight " 'may have been improved to a better outcome,' " an attempt to quantify what improvement might have been obtained "would amount to sheer speculation[.]" *Id.* at 300, 664 S.E.2d at 338. This Court held, after reviewing this testimony, that "Plaintiff's evidence was insufficient to establish the requisite causal connection between Defendants' alleged negligence and Plaintiff's blindness." *Id.*

In *White*, 88 N.C. App. at 383, 363 S.E.2d at 205, the plaintiff's expert testified that the decedent's chances of survival would have increased if he had been transferred to a neurosurgeon earlier. On appeal, the Court affirmed the order granting summary judgment in favor of the defendant, explaining that "plaintiff could not prevail at trial by merely showing that a different course of action would have improved [the decedent's] chances of survival." *Id.* at 386, 363 S.E.2d at 206. The Court emphasized that "[p]roof of proximate cause in a malpractice case requires more than a showing that a different treatment would have improved the patient's chances of recovery." *Id.* The Court concluded: "The connection or causation between the negligence and death must be probable, not merely a remote possibility."*Id.* at 387, 363 S.E.2d at 206.

In this case, Dr. Wyatt supplied the testimony that was missing in *Lord* and *White*. While the experts in *Lord* and *White* merely testified that complying with the standard of care would have given the plaintiffs a "better" chance, Dr. Wyatt specifically testified that when patients with liver lacerations like that suffered by Duncan are hospitalized, monitored, and treated, "most" of them survive. He further testified that if the defendants had followed the standard of care, Duncan would have had a better than 51% chance of survival and that he believes Duncan would have survived. In sum, Dr. Wyatt's testimony established that Duncan's survival was not merely possible but rather was probable if defendants had complied with the standard of care. Although defendants point out that Dr. Wyatt could not say to an absolute certainty that Duncan would have survived, absolute certainty is not required. We hold that Dr. Wyatt's testimony was sufficient to send the issue of proximate cause to the jury.

IN RE J.K.C.

[218 N.C. App. 22 (2012)]

In sum, we hold that plaintiffs presented sufficient competent evidence through Dr. Mele that defendants breached the applicable standard of care. Further, Dr. Wyatt provided sufficient evidence of proximate causation. Since those are the only two elements at issue, we hold that the trial court erred in entering a directed verdict in favor of defendants.

Reversed.

Judges ROBERT C. HUNTER and CALABRIA concur.